COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Julius CALLNER, Sarah Callner, Respondents.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Morris J. OKRENT, Esta Okrent, Respondents.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Abner E. KOPS, Respondent.

Nos. 13178–13180.

United States Court of Appeals Seventh Circuit.

March 14, 1961.

Abbott M. Sellers, Acting Asst. Atty. Gen., Sharon L. King, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Richard D. Hobbet, Milwaukee, Wis., for respondents, Michael, Spohn, Best & Friedrich, Milwaukee, Wis., of counsel.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

The Commissioner of Internal Revenue has petitioned for review of the Tax Court's decisions that, contrary to the Commissioner's contention, transfer of property to the taxpayers in 1950 was not a taxable dividend distribution.

The facts are largely stipulated and uncontested. The Commissioner asks this Court to review the legal effect of the facts shown by the record and to sub-

stitute its judgment for that of the Tax Court.

Sarah Callner and Esta Okrent are included as respondents here only because they filed joint income tax returns with their husbands for the taxable year 1950. We shall refer to the respondents Julius Callner, Morris J. Okrent and Abner E. Kops as the "taxpayers."

In June, 1945, the taxpayers entered into a contract to purchase improved real estate for $45,500, $11,000 to be paid down, and $34,500 to be paid over a seven-year period. In December, 1945, they formally organized the Capitol Lumber Company, a Wisconsin corporation. All three taxpayers were equal and sole stockholders and directors. Mr. Callner was President, Mr. Okrent Vice-President, and Mr. Kops Secretary-Treasurer, from 1945 through 1950.

Earlier in July, 1945, the taxpayers leased the land and buildings which they were acquiring under the aforesaid contract, to Capitol Lumber Company, which was to assume, and pay as rent therefor, all payments due under the land contract, plus certain other charges. It was also agreed that when the land contract payments were completed, the property would be leased to Capitol for five additional years from January 1, 1951, through December 31, 1955.

When Capitol tried to secure a line of bank credit, bank representatives suggested assignment of the taxpayers' interest in the land contract to Capitol. On January 3, 1946, the taxpayers, as directors, ratified the lease described above, and also executed an assignment of the land contract to Capitol. The two wives did not join in this assignment. The Tax Court found that it was the intention of the taxpayers to retain their interests in the premises covered by the land contract and that it was their purpose merely to loan the property to Capitol for credit purposes, and not to convey title to Capitol.

The taxpayers point out that their wives did not join in the assignment and

that Capitol could not have secured clear title, as the Commissioner contends it did, because Mrs. Callner and Mrs. Okrent had outstanding dower interests which were never transferred to Capitol. The Commissioner asserts that the two wives had no dower rights because their husbands had no legal or equitable title, merely a contract right to purchase, relying on Olsen v. Ortell, 1953, 264 Wis. 468, 59 N.W.2d 473 and Inglis v. Fohey, 1908, 136 Wis. 28, 116 N.W. 857.

In the Inglis case, a husband having a contract for purchase of land, on which he had paid nothing, agreed for a consideration to divide it with another, whose right was held to be superior to dower rights. In the Olsen case, a husband had a contractual right based on a purchase contract not signed by his wife. He was in default. The wife was held to be neither a necessary nor a proper party defendant in an action for strict foreclosure of the land contract. However, in Mueller v. Novelty Dye Works, 1956, 273 Wis. 501, 78 N.W.2d 881 at page 883, the Supreme Court of Wisconsin stated:

"In equity, then, the vendee, at the time the agreement is entered into, becomes the owner of the land; his equitable interest is in the property. The vendor becomes trustee of the legal title for the vendee; his (vendor's) interest is in the purchase money, and he has a lien on the land as security for any unpaid balance of such money."

and further (at pages 883–884 of 78 N.W.2d):

"If the vendor marries after entering into a land contract, his wife obtains no dower in the land."

The Tax Court also found that the taxpayers, who had no knowledge of accountancy or bookkeeping, engaged an accountant, Henry N. Kaufman, to set up and maintain a bookkeeping system for Capitol. Mr. Kaufman testified that he would go to Capitol's office once or twice a month to make entries in its books,

and that at the end of each year, he would prepare Capitol's tax returns from the books without discussing the returns with the taxpayers. To his knowledge the taxpayers never looked at the books. His opening entry in Capitol's books shows Capitol to be the owner of the land and buildings under the land contract. He testified that he had had a conversation with Mr. Callner, toward the end of 1945, and:

> "I don't remember what was said or done at the time. But my general impression is that they had purchased the land and the building, and I recorded it that way on the books, subject, of course, to a land contract." (Transcript, p. 131.)

The opening journal entry read:

"Land $41,000.00
Building 14,000.00
Land Con-
  tract Payable $34,500.00
Common Stock 20,500.00"

After the payments had been completed, deed to the property was delivered December 11, 1950, to the three taxpayers jointly, by the land contract vendors. On January 2, 1951, the taxpayers through a partnership (Calnorab Co.), entered into a lease of the premises to Capitol.

The Tax Court found that it was only after this second lease and payments of rent thereon, that Mr. Kaufman, working with Capitol's books, discovered for the first time, any indication that Capitol did not own the premises it occupied, but merely leased them. He testified that he made this discovery in 1951, but did not fix the exact date. Mr. Callner testified that he thought Mr. Kaufman brought this matter to his attention in January, 1951. After discussion of this matter with the several taxpayers, who ultimately instructed Mr. Kaufman to do whatever he thought would be right, Mr. Kaufman decided to correct the books by making "reversing" entries as follows, at the end of the year, 1951:

"Reserve for Depreciation,
  Building $ 3,080
Loan Receivable
  (Calnorab Co.) 34,500
Capitol Stock 17,420
    Land $41,000
    Building 14,000"

As indicated, Mr. Kaufman made out income tax returns for Capitol for 1945 through 1950, based on the books which he kept. He included the land and buildings as assets. He deducted real estate taxes paid on the property and claimed depreciation as a matter of course. He did not deduct as rentals the payments Capitol made under its first lease with the taxpayers. In their individual income tax returns for 1946 through 1950, also prepared for them by Mr. Kaufman, the taxpayers did not report as income the payments made by Capitol on the land contract, nor did they deduct depreciation on the premises. Mr. Kaufman testified that he prepared the individual returns for the taxpayers who usually gave him a list of what they considered to be their deductible or taxable income items. Outside of an occasional question on capital loss or gain, Mr. Kaufman recollected no discussions respecting the returns. He prepared the returns and presented them to the taxpayers for signature. He testified that they usually signed immediately in his presence, the two married taxpayers then taking the returns home for signature by their wives.

The Commissioner argues that by the assignment of January 3, 1946, the taxpayers parted with all their rights to the land contract and that Capitol became the owner of the premises when the balance due on the contract was paid. Thus when the vendors executed a deed to the taxpayers, the Commissioner considers that there was in effect, a distribution of the property by Capitol which consisted of a taxable dividend. The Commissioner analyses the actions taken by the taxpayers and concludes that they made an absolute transfer to Capitol in 1946 and that their subsequent actions were

consistent with such a transfer. He finds their actions inconsistent with the retention of ownership. However, their tax returns, the entries on the books, and all the other circumstances on which the Commissioner relies, are all consistent with the original mistake made in setting up the books. It is, at least, equally reasonable to apply the intent of the parties, as the Tax Court did here, to determine the actual substance of the conflicting lease and assignment ratified and executed on the same day. In Jennings v. United States, 7 Cir., 1959, 272 F.2d 842, this Court held that the intention of the parties was a major factor in determining the true nature of the relationship between the parties and the legal effect of the facts as found by the trial court.

■ As stated, the Tax Court found that the taxpayers' purpose in executing the assignment was to loan the property to Capitol for credit purposes and not to convey title to the land, and when the taxpayers received the deed, they received it pursuant to the terms of their land contract, and not as a dividend from Capitol. The evidence supports this finding.

The Tax Court also found that $7,000 was paid by Capitol to the vendors under the land contract in 1950, the sole year with which we are here concerned. One-third of that amount was allocable to each of the taxpayers.

The Commissioner sent his notices of deficiency to the taxpayers on March 19, 1957. The taxpayers had executed consents in writing to the extension of the period of limitations on the assessment and collection of income taxes for 1950 to June 30, 1957, provided that the provisions of Section 275(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 275(c) were applicable.

■ Section 275(c) is applicable if the taxpayer omits from gross income an amount properly includible therein in excess of 25% of the amount of gross income stated in the return. The allocated sum of $2,333.33 was considerably less than 25% of the gross income stated by the taxpayers in their respective returns for 1950. We agree with the Tax Court that the Commissioner failed to discharge his burden of proving the applicability of Section 275(c), on which the consents were conditioned. The general three-year period of limitations having expired, the Commissioner may not assess against taxpayers their proportional shares of the 1950 rental income in the amount of $7,000.

■ The Commissioner further asserts that if there is to be a choice between conflicting documents and entries, it should lie with him, as he has relied on the apparent transfer of title to Capitol, and the taxpayers should not now be allowed to alter their position. We agree with the taxpayers that the Commissioner improperly raises this argument of equitable estoppel for the first time here, not having pleaded or argued it before the Tax Court [Helvering v. Salvage, 1936, 297 U.S. 106, 108–109, 56 S.Ct. 375, 80 L.Ed. 511] where the taxpayers might have shown that, by reason of their error in accounting, they overpaid taxes for 1946 through 1950. It does appear that Capitol overpaid its taxes for those years in failing to deduct the rental paid, which exceeded the depreciation which Capitol erroneously deducted instead.

We have considered all other points and arguments advanced by the Commissioner in reaching our conclusion that the Tax Court must be affirmed.