NICHOLLS, NORTH, BUSE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HERBERT A. RESENHOEFT AND CHARLOTTE RESENHOEFT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5048–67, 5059–67. Filed August 31, 1971.

1226

*John P. Miller* and *Thomas P. Guszkowski*, for the petitioners.
*John L. Pedrick* and *Matthew W. Stanley, Jr.*, for the respondent.

WITHEY, *Judge*: The respondent determined deficiencies in income tax against the corporate petitioner for the taxable years ended December 31, 1963, and December 31, 1964, in the respective amounts of $299.16 and $2,260.11 and against the individual petitioners for the same years in the respective amounts of $388.91 and $36,359.62. The only issue affecting the year ended December 31, 1963, for either petitioner has been settled by stipulation which will be given effect under Rule 50.

The issues remaining unresolved are first, whether respondent erred as to petitioner Nicholls, North, Buse Co. in the disallowance of depreciation and operating expenses of a boat purchased with corporate funds and in the disallowance of the investment credit related thereto, and second, whether respondent erred as to petitioners Herbert A. Resenhoeft and Charlotte Resenhoeft in his assertion of a deficiency on the theory that a constructive dividend was received to the extent of either the purchase price of the boat or the value of the use of the boat.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Nicholls, North, Buse Co., a Wisconsin corporation, hereinafter referred to as Nicholls, had its principal place of business in Milwaukee, Wis., and filed Federal corporation income tax returns for the years 1963 and 1964 with the district director of internal revenue, Milwaukee, Wis.

Petitioners Herbert A. Resenhoeft and Charlotte Resenhoeft, husband and wife, filed joint tax returns for the years 1963 and 1964 with the district director of internal revenue in Milwaukee, Wis. They resided in Milwaukee, Wis., at all times pertinent to this proceeding. Since Charlotte Resenhoeft is a party herein only because she filed a joint return, Herbert A. Resenhoeft will hereinafter be referred to as Resenhoeft.

Nicholls was engaged as a broker of foodstuffs, seed peas, containers, field warehousing, and the rental of equipment related to the food-

packing industry. Due in part to the canners' frequent inability to obtain necessary credit from banks and Nicholls' dependency on the survival of small canning companies, Nicholls also provided to canning companies with whom it had brokerage relationships substantial credit in the form of loans. These loans were financed by Nicholls primarily through the borrowing of funds from the First Wisconsin Bank, Milwaukee, Wis., under an open line of credit. During the year 1964, Nicholls carried a monthly notes receivable balance ranging from a high of $801,677 to a low of $306,305. At December 31, 1964, Nicholls' current liabilities included $717,000 in notes payable to the bank. In its operation as a broker, Nicholls served canning companies in their acquisition of raw materials, supplies, and warehousing services, and in the sale of their product to wholesalers and retailers of foodstuffs.

In 1964 the common-stock ownership, officers, and directors of Nicholls were as follows:

| Shareholders | Number of shares | | Officer | Director |
| --- | --- | --- | --- | --- |
| | Class A common | Class B common | | |
| Herbert A. Resenhoeft | 577 | 3,057 | X | X |
| Charlotte Resenhoeft | 264 | 1,088 | X | X |
| Robert R. Resenhoeft | | 2,212 | X | X |
| James Resenhoeft | | 2,212 | | X |
| Total | 841 | 8,569 | | |

Nicholls had only common stock outstanding. The shares of class A common and class B common were identical in all respects except that the latter had no voting rights.

Nicholls has paid no dividends from its inception through the years in question.

Shareholders Robert R. Resenhoeft and James Resenhoeft, noted above, are the sons of petitioner Herbert Resenhoeft. In 1964, James was 25 years old and although not an officer he was Nicholls' sales manager and had been employed by Nicholls on a full-time basis since 1961. Robert and James received their stock through periodic gifts from Resenhoeft as well as by purchase.

Resenhoeft has been a principal stockholder since the company's beginning in 1921. During 1963 and 1964 in his capacity as president of Nicholls, Resenhoeft was required to meet customers, suppliers, and business associates.

Resenhoeft's compensation from Nicholls for the year 1964 and for several previous years was set by formula at 75 percent of Nicholls' profit prior to deducting income taxes. During the year regular salary entries were charged to salary expense and added to Resenhoeft's drawing account, and following the end of the year an adjusting entry was made to reflect the difference between that already charged and

the amount equaling 75 percent of pretax profits. During 1964, Resenhoeft's total compensation from Nicholls thus computed was $22,695. However, not all of the amounts added to the drawing account were paid to Resenhoeft in cash. The drawing account, representing an amount payable to Resenhoeft, was reduced by adjusting entries for taxes withheld and for certain expenses paid by Nicholls which were determined to be personal expenses of Resenhoeft. In 1964, these expenses included all or a part of some club bills, a portion of the expenses of two autos owned by Nicholls but used by Resenhoeft, and 25 percent of the combined total depreciation and operating expenses for the year for the boat *Pea Picker III*. The amount of boat costs charged to Resenhoeft's drawing account for 1964 was $1,144.72. Nicholls' general practice was that the allocation of corporate expenditures between Resenhoeft's personal expenses and business expenses was made by Resenhoeft's secretary and bookkeeper, Meta Herzog, based on her understanding of Resenhoeft's business and private activities; occasionally Meta received specific direction from Resenhoeft as to the appropriate recording of an expenditure.

*Pea Picker III*, the yacht at the center of this controversy, was a Chris Craft Constellation, a 52-foot wood-hulled cruiser with teak decks. It contained sleeping accommodations for passengers (two staterooms), and crew's quarters, as well as a bathroom and galley. It was propelled by two inboard gasoline engines developing 275 horsepower each. The yacht was equipped with radar, ship-to-shore radio, and several pieces of additional optional equipment. The added equipment provided better all-weather navigability and stability. Most of the optional equipment was installed at Pompano Beach, Fla., the site of construction, although some pieces were added by the dealer in Milwaukee, Wis.

Prior to the time of purchase of *Pea Picker III*, Resenhoeft was the owner of boats *Pea Picker I* and *Pea Picker II*. *Pea Picker I* was acquired for $7,200 in 1960 and sold in 1961 for $6,000. At the time of that sale, *Pea Picker II* was acquired for $23,000. *Pea Picker II* was sold on August 24, 1964, the day following the date of final payment for *Pea Picker III*, to the distributor from whom *Pea Picker III* was purchased. The proceeds from the sale of *Pea Picker II*, $20,000, were paid by the purchaser to Resenhoeft who, by prior arrangement, loaned the same amount to Nicholls to aid in the purchase of *Pea Picker III*. This loan was to be repaid at a rate of $4,000 per year, beginning July 1, 1965. The payment due in 1965 was made on a timely basis.

*Pea Picker II* was a 1954 model, built by the Christ Craft Co., had a length of 45 feet, and was powered by two gasoline engines. She was used occasionally by James and/or Resenhoeft for entertain-

ment of persons related to Nicholls' business. Each of Resenhoeft's sons was free to operate each of the craft, including *Pea Picker III*, without special permission. Resenhoeft himself was unable to operate any of the three crafts and had little if any technical knowledge of their capacity or characteristics. James appears to have been the principal operator of all three boats, and was a boating enthusiast during 1964 and for several previous years.

Because of his experience with *Pea Picker I* and *II* and because of Resenhoeft's total unfamiliarity with such craft, it was James rather than Resenhoeft who negotiated the purchase of *Pea Picker III*. Negotiations were between James and the Chris Craft distributor in Milwaukee, Wis., although the boat being purchased was located at the place of its construction, Pompano Beach, Fla. The invoice was prepared in Nicholls' name for the total purchase price. There was no reduction of the amount of the transaction as recorded for State sales tax purposes due to the purchase by the dealer of *Pea Picker II* from Resenhoeft, although that was a normal practice when trade-ins occurred. Such a step would have resulted in a sales tax saving to Nicholls in the amount of $600. A licensed sea captain, William Farrington, and a mate were employed to take delivery of the boat in Pompano Beach and bring it by water to Milwaukee, Wis. Farrington was paid by Nicholls at the end of his voyage which involved in excess of 300 hours' use of each engine.

Subsequent to the initial $3,000 deposit, paid by check drawn on Nicholls' account, but prior to the final payment of $57,000, also paid by check drawn on Nicholls' account, the Nicholls board of directors, in a special meeting, unanimously approved the purchase, stating in the resolution "any expenses incurred in the personal use of the boat are to be borne by H. A. Resenhoeft and an accurate log is to be kept of all business use." By letter dated the day of the special meeting of the board, Nicholls delivered a certified copy of the minutes approving the purchase to the bank which provided the bulk of Nicholls' credit. The parties have stipulated that the yacht was "acquired" by Nicholls.

Nicholls did not obtain immediate documentation of *Pea Picker III* by U.S. Customs due primarily to difficulties of admeasurement of so large a craft. Some time was spent in corresponding with the Christ Craft Corp. and Lloyd's Register of American Yachts in an unsuccessful attempt to get measurements which might have been already recorded from an identical craft. In May of 1965 a license was received from the Federal Communications Commission to operate ship-to-shore radio and radio-navigation equipment installed on *Pea Picker III*. The license was issued in Nicholls' name. Documentation had still not been obtained from U.S. Customs in August 1965 when a citation

was issued to Nicholls by the Coast Guard for failure to display a valid certificate number. Application for Wisconsin boat registration, an alternative to the Federal registration process, was made and a number received on April 20, 1966. The application was made in the name of Nicholls and signed by Resenhoeft as president.

Contra to the above formal indicia of ownership, the Lake Michigan Yachting Association, in the business of cataloging persons and yachts associated with yacht clubs located on waters of the Great Lakes listed James as the owner of *Pea Picker III*. There was no provision, however, for listing corporations or persons not belonging to yacht clubs as owners of the craft. James had also been listed in previous volumes as the owner of *Pea Picker II*. The chief benefit of a listing by the association was ready identification by other yachters and the ease of reciprocal access obtained to yacht clubs where the person listed was unknown.

The delivery of *Pea Picker III* from Florida to Milwaukee was somewhat eventful and required in excess of 300 hours' use of each of its engines. During the trip the yacht was run aground on several occasions and failure and replacement of an engine part was experienced. On the last leg of its journey across Lake Michigan, it was in a collision with underwater debris which resulted in a bent propeller shaft and damage to a propeller which in turn resulted in excessive vibration during its operation. Except for the above facts, the boat was delivered in Milwaukee in "new-boat condition." This term relates to its condition above the waterline. After being delivered, the boat was berthed at a yacht club in Milwaukee where repair work was done on the propellers and shafts, some additional navigational equipment was installed, and there were installed aileron-type stabilizers. The vessel was delivered to Milwaukee from Florida by Farrington, an experienced seaman who, upon completion of his voyage, recommended that the boat's engines be replaced and warned that in the event they were not replaced, certain parts which had failed on the delivery trip might fail with continued use. He also warned that at certain speeds the vibration mentioned above would tend to cause further damage.

*Pea Picker III* was delivered to Milwaukee on September 4, 1964, approximately the end of the boating season for that region due to the increasing unpredictability of the weather.

Following the arrival in Milwaukee and the required lay-up time for repairs and equipment installation, there was scheduled a "shake-down" cruise to various ports on Lake Michigan. Such a cruise is a normal procedure for a newly delivered vessel of the size and immediate past history of the *Pea Picker III*. Its purpose is to acquaint the new operator with the handling characteristics of a boat and to disclose any possible deficiencies in its structure, engines, and equip-

ment. This is particularly true where a boat is to be used for the carrying of passengers. The cruise of *Pea Picker III* was not a pleasure trip, but was consistent with its intended use as a business entertainment facility.

Although the shakedown cruise was intended to last only 5 days, the return to home port was on the 11th day, the trip began on September 12 and ended on September 22. The additional time spent was caused chiefly by foul weather and the waiting for repairs to be made en route. The cruise began and ended in Milwaukee, extending across Lake Michigan to various ports and points of interest on the Michigan side and then north to Sturgeon Bay, Wis., approximately 125 miles by water from Milwaukee. *Pea Picker III* proceeded directly to Milwaukee upon departure from Sturgeon Bay.

Except for the final leg from Sturgeon Bay to Milwaukee, those regularly on board during this shakedown cruise were Resenhoeft, Charlotte Resenhoeft, James, Meta Herzog, and Frederick Hankwitz who was a friend of James brought along to assist in the operation of *Pea Picker III.* On three of the 11 days, September 18, 19, and 20, while *Pea Picker III* was docked at Sturgeon Bay, there were guests on board who were employed by companies doing business with Nicholls. The final leg to Milwaukee was made by Charlotte, Robert, and Robert's wife. Robert and his wife joined the operation in Sturgeon Bay. Resenhoeft, James, and Hankwitz returned to Milwaukee by other means.

Following the return to Milwaukee on September 22, 1964, *Pea Picker III* was operated or used on no less than 9 days, the last being the October 26, 1964, trip from Milwaukee to Sturgeon Bay, the location chosen for winter storage. Of the 8 days remaining after excluding the final journey for storage, *Pea Picker III* was used as follows: The boat was admittedly limited to personal use by James on 2 of the 8 days; on 6 days, there was some use for business purposes. Those 6 were September 28, 30, October 6, 10, 14, and 15.

The use of the boat on dates in 1964 for business purpose ranged from having her tied to the dock but with guests aboard for drinks to using the boat for drinks and conversation on board in conjunction with local area cruises.

The log-register for 1964 opens with a description of *Pea Picker III*, its delivery trip from Florida, difficulties encountered on the way, and maintenance of its engines. Thereafter the log contains points of departure while being operated, departure time, estimated time of arrival at its intended destination or the next check-point, upon occasion the compass course, r.p.m.'s of the engines, estimated speed, wind direction encountered and its force, and weather and visibility comments. The guest register contains the names of persons aboard

while the boat was being operated and also when persons were being entertained with the boat berthed at dockside. In some instances, the business connection of the guest is also indicated. Under the heading of remarks, there is made a general running account of trips, comments upon shore facilities, impressions of boat and equipment performance, navigation, and random remarks concerning weather, guests, or passengers. On only one occasion was an entry made regarding business actually transacted. On no occasion is an entry made with respect to the expense of entertainment on the boat. The last 1964 entry is with respect to a trip of about 9 hours duration from Milwaukee to Sturgeon Bay, Wis., for the purpose of storing *Pea Picker III* for the winter.

James' primary purpose for recording events in the log was to preserve what he believed to be an adequate record of actual operation of the boat and of the occasions on which business guests were on board. The recordings were made in the log personally by James and by requesting guests to sign the log, with either the guests or James making a notation of the company with which each guest was associated. For 1965, the log of the *Pea Picker III* indicates an increased effort to indicate the nature of the business transaction as well as the titles or employers of business guests.

Besides the events recorded in the official log, there were an unidentified number of days in 1964 during which James was aboard in the company of nonbusiness friends for periods of 1 to 3 hours. For the most part, these occasions took place not by design or advance planning but as a result of spur-of-the-moment invitations extended to friends present at the yacht club at times when James was on board for purposes of maintenance and upkeep.

The cost of *Pea Picker III* including the charges for moving the boat from Florida to Wisconsin was $68,290. Depreciation was taken for Federal income tax purposes in 1964 in the amount of $2,845. Operating expenses were incurred in the amount of $1,734 although the deduction for Federal income tax purposes was only $589 due to the allocation to Resenhoeft of 25 percent of the combined depreciation and operating expense. Nicholls claimed on its tax return for 1964 entitlement to investment credit for the full purchase price of *Pea Picker III*.

In the notice of deficiency dated July 28, 1967, and mailed to Nicholls, the respondent determined that the *Pea Picker III* was not qualified investment credit property, disallowed the depreciation citing sections 167 and 274 of the Internal Revenue Code of 1954, and disallowed the deduction for the $589 remaining in the boat expense account on the basis that the expense was not an ordinary and neces-

sary business expense or alternatively was not allowable under the provisions of section 274.

In the notice of deficiency dated July 28, 1967, and mailed to Resenhoeft, the respondent determined, *inter alia*, that in 1964 Nicholls had "expended $68,878.72 on your behalf consisting of $68,290 to acquire a yacht and $588.72 as yacht expenses. It is held that these amounts represent additional income taxable to you."

On December 29, 1969, respondent filed a motion to amend his answer, stating that "in said statutory notice the respondent determined that the cost of acquisition of a yacht represented a taxable dividend to petitioner Herbert A. Resenhoeft in the amount of such cost of acquisition. The respondent has concluded that alternative to such determination, the dividend to petitioner * * * as a result of the acquisition of said yacht may be the fair rental value thereof."

OPINION

### Nicholls

Nicholls' contention is that *Pea Picker III*, except for that portion previously allocated to Resenhoeft, was acquired and used for corporate business purposes and consequently that the depreciation and operating expenses were deductible under sections 167 and 162 of the Internal Revenue Code of 1954. Respondent's claim is that the use of the boat fails to meet the substantiation requirements of section 274, fails to meet the ordinary-and-necessary test of section 162, and constitutes a dividend to Resenhoeft, each reason being independently sufficient to deny deduction by Nicholls.

Section 162 of the Code provides for the deductibility of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 167 provides for the deductibility of depreciation of property used in the trade or business. The general requirement of both section 162 and section 167 that expenses and assets be attributable to a trade or business has led to repeated litigation involving both the nexus between expenditure and enterprise and the quantum of evidence necessary to substantiate the event and its surrounding circumstances. Section 274 was added to the Code by the Revenue Act of 1962, and is applicable here, for the purpose of limiting what the Congress felt were substantial abuses in the area of deductions for, *inter alia*, entertainment and entertainment facilities.

Section 274 treats separately expenditures related to activities and those related to facilities, but requires for both categories a direct or primary relationship between the expenditure and the business enterprise; furthermore the section sets out strict requirements for the substantiation of deductions for both activities and facilities, and gives

the Secretary or his delegate broad powers to implement the section through regulation. Regulations have been promulgated and have been held generally in accord with the statute. *William F. Sanford*, 50 T.C. 823 (1968), affirmed per curiam 412 F. 2d 201 (C.A. 2, 1969) ; but see *LaForge* v. *Commissioner*, 434 F. 2d 370 (C.A. 2, 1970), remanding 53 T.C. 41 (1969). Of primary concern in this case is section 1.274–2, Income Tax Regs., which sets forth the relationship between the purpose of the expenditure and the business enterprise, and section 1.274–5, Income Tax Regs., which provides the rules for substantiation of the factors emphasized in section 1.274–2. Except as noted in *LaForge*, *supra*, the heavy burden of substantiation set forth in these regulations is in accord with the congressional committee reports [1] explaining the addition of section 274 to the Internal Revenue Code.

The expenditures presently in question relate to the original cost and expenses of operation and maintenance of the *Pea Picker III* and as such are to be tested by those rules applicable to facilities rather than activities. Sec. 1.274–2(e)(2)(i), Income Tax Regs. Petitioner Nicholls argues in brief that the 50-percent test used to determine whether the primary use of the facility was for business purposes, as set forth in section 1.274–2(e)(4)(iii), was satisfied. Nicholls' claim is that following the shakedown cruise in 1964, *Pea Picker III* was used six times for business reasons and only twice for personal reasons. Furthermore, Nicholls argues, each of the days of the shakedown cruise must be considered a business-use day since there the use was preparatory for the intended business use to follow. On close analysis of the evidence, Nicholls' arguments cannot be sustained.

On each of the six claimed business dates, or 9 if 3 days during the shakedown cruise are considered, the log contains a notation as to the business affiliation of some guests. However, for only 2 of those 9 days is there any mention or notation of a business discussion or other specific business purpose served by the gathering. Although a log entry for a third of the days does mention that the boat was brought up the Miller River in Milwaukee "for the purpose of entertaining our bankers and attorneys" there is no indication in the log that business was transacted on that occasion. Section 274(d) requires the disallowance of a deduction with regard to an entertainment facility unless

---

[1] S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), provides in part at p. 35 :

This provision is intended to overrule, with respect to such expenses the so-called *Cohan* rule. * * *

The requirement that the taxpayer's statements be corroborated will insure that no deduction is allowed solely on the basis of his own unsupported, self-serving testimony. * * *

Generally, the substantiation requirements of the bill contemplate more detailed record-keeping than is common today in business expense diaries. However, a clear, contemporaneously kept diary or account book containing information with respect to the date, amount, nature and business purpose of the expense may constitute an adequate record under this provision. * * *

there is either an adequate record made at the time of the activity, or sufficient evidence corroborating the taxpayer's own statement, of (a) the amount of the expense; (b) the time and place of the use of the facility; (c) the business purpose of the expense or other item; and (d) the business relationship of persons entertained or using the facility. As we held in *John L. Ashby*, 50 T.C. 409 (1968), each element must be established separately for each occasion of use.

In this case, although the log was generally silent as to business purpose of the various meetings, there was testimony by James, Nicholls' sales manager, regarding the business matter discussed on each of the alleged buiness days. For example, James' remarks when asked what was discussed on the 10th of October 1964 were as follows:

There again it would have been twofold; Mr. Ritter [vice president of a seed company] would have been in to discuss some credit situations regarding seed that had been sold and not yet paid for, which we had advanced monies to Morrisson Brothers [the seed company] on and, of course, future business with Ralph Resenhoeft [James' cousin who was employed by American Can Co.]. I really can't remember what may have been discussed, whether it could have been personal or something of business.

In net effect we believe James' testimony largely reflects his conjecture as to what probably was discussed on most, if not all, occasions rather than clear memory of business discussions actually taking place. It was exactly this type of conjecture that the substantiation requirements of section 274 were designed to foreclose. See S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), *supra*. Even if James' testimony were to be given greater weight than that we have just ascribed, there must still be evidence in addition to the statement which is sufficient to corroborate that element. Sec. 1.274–5(c)(3)(ii), Income Tax Regs., *LaForge* v. *Commissioner*, *supra*; *John L. Ashby*, *supra*. In *LaForge*, the Court of Appeals held that the requirements of section 274 may be met by credible oral testimony plus other corroborative evidence. The regulations state "If such element is either the business relationship to the taxpayer of persons entertained or the business purpose of the expenditure, the corroborative evidence may be circumstantial evidence." Sec. 1.274–5(c)(3), Income Tax Regs. The committee report states:

circumstantial evidence, such as the nature of the business activities of the taxpayer and of the person entertained, may be sufficient to corroborate the taxpayer's statement regarding business purpose and business relationship, * * * [S. Rept. No. 1881, 87th Cong., 2d Sess., p. 174 (1962).]

There is, however, no other circumstantial evidence available in the record to substantiate the missing link of business purpose of the meetings. Although the business relationship arguably has been circumstantially proven by the listing in the log of the employers of the

various guests, i.e., companies with whom Nicholls does business, the mere presence of a person with whom business is transacted is not sufficient circumstantial proof that on that occasion such business was transacted.

In *William F. Sanford, supra*, the petitioner submitted in evidence a diary giving, among other things, the names of persons entertained, the advertising agencies they represented, and the type of business discussed. In that case we commented at page 827 that:

Certainly, the fact that petitioner may have entertained "advertising agency people" at these dinners is not conclusive of the business character of the meals, for at least some of these people may also have been personal friends of petitioner, and the business aspects of the occasion may have been minimal or wholly nonexistent. * * *

Nor can we say that there need not have been a specific business discussion (one which we are unwilling to infer from the mere corporate titles of those on board). Section 1.274–2, Income Tax Regs., provides for deductions regarding entertainment in two instances; the first being directly related entertainment, sec. 1.274–2(c) ; and the second being associated entertainment, sec. 1.274–2(d). Since we have decided that there is not sufficient evidence of specific substantial business discussions which is a prerequisite to the deduction of associated entertainment, sec. 1.274–2(d)(1), the alternative is to look to the requirements of directly related entertainment contained in section 1.274–2(c). But here petitioner Nicholls' arguments also fall short of the mark since section 1.274–2(c)(3)(iii) requires that the principal aspects of the event must have been the anticipated active conduct of the trade or business and provides that:

The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on hunting or fishing trips or on yachts and other pleasure boats unless the taxpayer clearly establishes to the contrary.

Nor does the remaining corroboration offered by Nicholls consisting of testimony of Hankwitz and Reynolds, both of whom were on board on various occasions to aid in handling the boat, help in establishing to the contrary. Neither could testify as to specific occasions or business discussions. At best their testimony merely aids in the conclusion that some of the various guests were connected in some way with businesses with whom Nicholls had dealings, a fact established directly by the log.

The two occasions where business discussions are specifically mentioned in the log fell on September 19, 1964, and October 15, 1964. On September 19, the log recites "that the guests arrived and talk naturally turned to cherry and apple crops"; but then the log states "after a few drinks [the parties] all repaired to the yacht club for dinner, drinks and more conversation * * *." Such evidence, if it

proves anything, shows that the main business discussions occurred at the yacht club rather than on board the boat, and that any discussion of business on board was incidental. The occasion of October 15 presents a slightly different problem. The log shows that the guests were from the Stokely-Van Camp Co., and recites "sold 7,500 cases to them." Although the log is silent as to the purpose of the visit, James' testimony plus the circumstance of the actual sale do constitute a satisfaction of the substantiation requirements of section 274(d) for that date. Nicholls' argument as to occasions other than the Van Camp incident is that the log is open to general inspection and therefore it is not possible to give adequate detail of business transacted. This argument is inconsistent with the nature of the Van Camp entry and is inconsistent with the entries in the log for the year 1965 discussing specific transactions as well as the total business done in the past year with various guests. In addition, Nicholls has put forth no convincing reasons why supplementary and private records were not maintained. Sec. 1.274–5(c)(2)(ii)(c).

In summary, we are left with a total of 11 documented uses in 1964, 3 occurring during the shakedown cruise all of which fail the substantiation test of section 274(d), 2 admitted personal usages which followed the shakedown, 5 other occasions following the shakedown cruise also failing the test of section 274(d), and 1 which meets that test.

But even in the event that we were to accept the extremely weak corroboration and were to conclude that on each occasion of purported business use the substantiation requirements of section 274 had been met, we must nevertheless deny petitioner Nicholls the relief sought. The requirement of section 1.274–2(e)(4)(iii), Income Tax Regs., is that on more than 50 percent of the total calendar days of use of the facility there must have been a qualifying business use. For purposes of this argument only, there may have been 8 days of business use during 1964. Petitioner has not proven however that there were fewer than 8 days of personal use. The taxpayer admits to 2 days of purely personal use. From James' testimony it is clear that the log was maintained to record actual operations of the *Pea Picker III* rather than mere dockside use unless there was some specific reason to make a note of the dockside use, such as the presence of business related guests. James' testimony was that "there was times I was down there with just associates from the club. If I was aboard the boat and they came by I would ask them to come aboard and perhaps sat there for an hour or two or three." Whether much shorter visits might be deemed inconsequential need not be answered here. Visits on board *Pea Picker III* with nonbusiness-related friends lasting from 1 to 3 hours constitute as much a personal use as do the brief "business" visits for

cocktails prior to disembarking for dinner at the yacht club. Crucial to the question before us is the fact that there is insufficient evidence limiting the possible number of such occasions. No witness was in a position to observe all occasions on which the event may have occurred. We must conclude therefore that if there is evidence that there were some occasions of personal use which were not recorded, the taxpayer must provide more than mere testimonial assurances that the occasions were no more than *de minimis* in nature and frequency. Regulations section 1.274–5(c)(6)(iii)(b) states that: "If a taxpayer fails to maintain adequate records concerning a facility which is likely to serve the personal purposes of the taxpayer, it shall be presumed that the use of such facility was primarily personal" rather than primarily business as required by section 1.274–2 (e) (4).

Since we hold that the yacht fails to qualify either in whole or in part as a depreciable asset, we must also hold that the yacht does not meet the section 48 definition of property qualified for investment credit. Sec. 1.48–1(b) (2), Income Tax Regs.

## Resenhoeft

The issues with regard to individual petitioner Resenhoeft resolve themselves down to the following: (a) Was there a constructive dividend; (b) may the use of the yacht by James, a stockholder in his own right, be imputed to his father who was in control of the corporation to make the father the recipient of the constructive dividend; and (c) is the measure of the dividend the purchase price of the craft plus actual operating expenses or is the fair rental value of the use of the yacht during the period in question the appropriate measure?

(a) It is well established that any expenditure made by a corporation for the personal benefit of its stockholders, or the making available of corporate-owned facilities to stockholders for their personal benefit, may result in the receipt by the stockholders of a constructive dividend. *International Artists, Ltd.*, 55 T.C. 94 (1970); *John L. Ashby, supra; Challenge Manufacturing Co.*, 37 T.C. 650 (1962); *American Properties, Inc.*, 28 T.C. 1110 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958); *Louis Greenspon*, 23 T.C. 138 (1954), modified 229 F. 2d 947 (C.A. 8, 1956). We may not conclude, however, that any item which is disallowed by reason of section 274 must for that reason alone be treated as a constructive dividend. *John L. Ashby, supra.* In the general explanation of section 274, H. Rept. No. 1447, 87th Cong., 2d Sess., provides in part at pages 19 and 20:

The only purpose of this section is to disallow deductions in certain cases and therefore this bill does not affect the question of the includibility or excludibility of an item in income of any individual. The rules presently applicable under present law will continue to govern in this respect. Thus, for example,

while pins or watches presented to an employee upon his retirement will not be regarded as gifts under this provision, this bill will have no effect in determining whether the recipient of the pin or watch will be taxed on their value.

Upon consideration of all the evidence, including the possible instances of unrecorded personal use, we conclude that *Pea Picker III* was used for business purposes 25 percent and for personal purposes 75 percent of the time in 1964.

(b) Since we have found that there was personal use constituting under some circumstances a dividend, the next question is, to whom was the benefit directed? Resenhoeft has established by convincing evidence that he was not interested in the yacht for his own personal pleasure as a boating enthusiast. He had little knowledge of the workings of such craft, could not operate them himself, and played no direct part in the purchase of *Pea Picker III* or the sale of her predecessor. However, to the extent that he was present on an occasion of personal use, he received a benefit and an argument that others benefited as well is of no avail here. *United Aniline Co.* v. *Commissioner*, 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court. He shared in the friendships and joined in the social activity on board on those occasions.

The question remains, however, whether James' personal use of *Pea Picker III* on occasions when Resenhoeft was not present may nevertheless be attributed to Resenhoeft. The essential elements underlying the taxation of assigned income to the assignor were set down in *Helvering* v. *Horst*, 311 U.S. 112 (1940). The Court stated in that case that: "The power to dispose of income is the equivalent of 'ownership' of it and the exercise of that power to procure the payment of income to another is the 'enjoyment' and hence the 'realization' of the income by him who exercises it." In this case Resenhoeft personally owned well over 50 percent of all voting stock and together with his wife owned all of it, and in addition was the president of the company and on the board of directors. It is manifestly clear that it was Resenhoeft's decision that the corporation acquire *Pea Picker III*. Resenhoeft's decision to allow the use of the boat by his sons as they desired and without direct control over either the circumstances of use or the maintenance of appropriate supportive documentation must be given particular emphasis. There is no indication here that information regarding the actual use of the boat, or the type of records maintained, was being kept from Resenhoeft or that he had no way of learning the truth. See *L. R. Schmaus Co., Inc.*, T.C. Memo. 1967–197.

The principle of assignment was applied to constructive dividends in *Byers* v. *Commissioner*, 199 F. 2d 273 (C.A. 8, 1952), certiorari denied 345 U.S. 907 (1953). See also *Commissioner* v. *Makransky*,

321 F. 2d 598 (C.A. 3, 1963). We remain unpersuaded that Resenhoeft's purpose in agreeing to the acquisition of a large pleasure craft was only to benefit the corporation. This is particularly so in light of his prior personal ownership of *Pea Pickers I* and *II* which were available for the use and benefit of his sons. Once it is understood that Resenhoeft was in complete control of the events, the fact that James, the principal user of the boat for noncorporate purposes, was a mature adult and a shareholder in his own right becomes irrelevant.

(c) Although we have determined that there was a dividend, and that the dividend must be attributed to Resenhoeft, we have yet to ascertain the amount of the dividend. Two standards have been used on different occasions, the first being the initial cost of the facility and the second, the approximate rental value for the period at issue. The standard to be chosen rests on the facts and circumstances of the event rather than on which year (the initial year of purchase or a subsequent year) happens to be before the Court, as was argued by respondent in his briefs. In *Louis Greenspon*, *supra*, the Court held that continued corporate ownership of farm equipment used by the petitioner shareholder prevented the assessment of a constructive dividend based on the purchase price of the equipment. No determination of a dividend was made based on the rental value since respondent failed to raise that issue. Our holding in *Greenspon* that ownership of the asset is a principal factor has not been altered by subsequent cases involving the year an asset was acquired. Although in some cases subsequent to *Greenspon* we have determined the amount of the dividend to be the acquisition cost, in those cases the evidence clearly pointed to shareholder ownership, *Frederick Von Hessert*, T.C. Memo. 1961–226; *Commissioner* v. *Callner*, 287 F. 2d 642 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court, or the location of title could not be determined and therefore was presumptively in the shareholder, *American Properties, Inc.*, *supra*. These cases have not been followed when the title was clearly with the corporation. *International Artists, Ltd.*, *supra* (residence purchased for corporate and shareholder use); *Morris A. Stoltzfus*, T.C. Memo. 1970–337 (horses purchased for benefit of shareholder); *Robert R. Walker Inc.*, T.C. Memo. 1965–28 (country club building fund assessment paid for benefit of shareholder).

In this case, ownership continued to rest with Nicholls. The bill of sale was made in Nicholls' name, Nicholls' principal creditor was informed of the purchase and the yacht's intended devotion to corporate purposes, a license to operate short-wave radio equipment installed on *Pea Picker III* was acquired in the corporate name, registration by U.S. Customs was attempted in the corporate name, registration and licensing was received from the State of Wisconsin

in the corporate name, and sales tax was paid by the corporation although a significant savings would have resulted by treating this as a purchase by Resenhoeft. Although a listing in the Lake Michigan Yachting Association catalogue showed James as the owner of the *Pea Picker III*, the association provided no means for noting corporate ownership, and registration in whatever name offered values significant to the corporation as well as to James. Therefore we hold that petitioner has not received a constructive dividend equivalent to the cost of acquisition of *Pea Picker III*.

The issue yet remaining is whether there is another more appropriate measure of the constructive dividend, a dividend which we have already decided Resenhoeft received.

Respondent's alternative theory is that the fair rental value of *Pea Picker III* for the period of use in 1964 is the measure of the dividend received; furthermore, respondent argues that the testimony of the captain in charge of delivering *Pea Picker III* from Florida corroborates the minimum rental value alleged in respondent's amended answer. The amended answer alleged that the fair value was not less than Nicholls' combined depreciation and operating expenses, $4,578.86, of which $1,144.72 concededly was included as income by Resenhoeft at the time he filed his 1964 return. Since we have already determined that Resenhoeft should be charged with 75 percent of the total value of the use of the yacht rather than 100 percent as argued by respondent, the remaining amount actually in dispute is $2,289.42. In support of the total rental value alleged, Farrington testified that he operated a charter service in Fort Lauderdale, Fla., renting boats similar to *Pea Picker III* for use at various points on the East Coast at approximately $150 per day or $1,000 per week. The period at issue here is from September 23, 1964, to October 25, 1964, or approximately 4½ weeks. Rental value should not be computed only for days of recorded use since we have held that the boat was freely available for personal use and in fact there were an indeterminate number of unrecorded personal uses.

Ordinarily, respondent's alternative allegation would be determinative since petitioner has offered no evidence showing that determination to be in error. However, since the theory of a dividend based on rental value comprises a separate issue, involving distinct factual questions, and was raised by the Commissioner for the first time in his amended answer, the rental value suggested by the Commissioner may not be given the presumption it would otherwise be due, *Leon Papineau*, 28 T.C. 54, 57 (1957); *Sheldon Tauber*, 24 T.C. 179, 185 (1955); Rule 32, Tax Court Rules of Practice. Upon considering all evidence, including the rental value of similar craft used in dissimilar water, we hold that the full rental value of *Pea Picker III* for the

period following the shakedown cruise and ending with the final storage of the boat was $4,000. Resenhoeft gained personal benefit and therefore received a constructive dividend from his own use and the use of the craft by his sons equaling 75 percent of the above rental value; of that amount he has voluntarily recognized income to the extent of $1,144.72. We have no reason to believe Nicholls' earnings and profits were insufficient for the payment of a taxable dividend of the amount determined above.

*Decision will be entered under Rule 50.*