Russell T. Smith and Florence V. Smith v. commissioner.
Smith v. Commissioner
Docket No. 3871-70.
United States Tax Court
T.C. Memo 1972-46; 1972 Tax Ct. Memo LEXIS 210; 31 T.C.M. (CCH) 190; T.C.M. (RIA) 72046; February 23, 1972, Filed. *210 Petitioners in 1964 sold at a loss a residential property which they had owned since 1956. They deducted the loss from ordinary income, claiming that the property had been used for business entertainment. Held, the loss is not deductible because petitioners have not shown that the property was used primarily in furtherance of a trade or business as required by sec. 274(a)(1)(B). Richard G. LaValley, 16th Floor, Toledo Trust Bldg., Toledo, Ohio, for the petitioners. Patrick R. McKenzie, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: Respondent determined a deficiency of $10,504.54 in petitioners' Federal income taxes for the year 1966. Petitioners dispute the asserted deficiency and also claim an overpayment for 1966 in the amount of $1,057.43. The sole question before the Court is whether petitioners under sections 165 and 274 and 1231 [1] are entitled to deduct a loss on the sale of a residential type property in 1966. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by *211 this reference. Russell T. Smith (hereinafter referred to as Russell) and Florence V. Smith are husband and wife, and at the time of filing their petition herein resided in Adrian, Michigan. Petitioners are on the cash basis of accounting, and for the taxable year 1966 filed a joint Federal income tax return. During 1966, and for all prior years here relevant, Russell was a partner in R. T. Smith & Sons of Adrian, Michigan. The partnership was a manufacturer's representative for Tecumseh Products Company of Tecumseh, Michigan. Russell, in October of 1966, retired at age 69 from his activities as a salesman for Tecumseh Products. On June 14, 1956, petitioners acquired residential property in St. Petersburg, Florida (hereinafter referred to as the St. Petersburg property), at a cost of $34,950. Improvements were added to the house at a cost of $14,292.91, and furnishings were provided for the house at a cost of $17,277. During all relevant years petitioners maintained a residence first in Adrian, Michigan, and then in Tecumseh, Michigan. The petitioners first made use of the St. Petersburg property in 1957. They went to Florida from Michigan and occupied the property shortly after January *212 1, 1957, and returned to Michigan in late March 1957. On 7 different days during their 1957 stay at the St. Petersburg property petitioners entertained Clyde Geltner (hereinafter referred to as Geltner) and his wife. Geltner was a good friend of Russell's and, by 1957, had retired as general manager of Tecumseh Products. Geltner and his wife had a house 12 miles away from the St. Petersburg property, and did not stay overnight with petitioners. Entertaining the Geltners involved lunches, dinners, and card playing, and going out together. Petitioners also had as guests for 2 days in 1957, Ray W. Herrick, (hereinafter referred to as Herrick), chairman of the board of Tecumseh Products, and his wife. Herrick and his wife normally came down to Florida each winter season for a period of several weeks and stayed at a hotel about 4 miles from petitioners' St. Petersburg house. Every Sunday while the Herricks were in Florida they went to church with petitioners and then had lunch and dinner at petitioners' house and on some occasions played cards. This routine of activity was repeated each winter season that Herrick and his wife visited Florida. Louis Younker, president of Bingham Stamping *213 Company, a supplier for Tecumseh Products, stayed with the petitioners for 2 days. Petitioners had staying with them for 2 weeks Gordon Price (hereinafter referred to as Price) and his wife. Price was president of Primer Products and Sedco, Inc., companies for whom 191 Russell sold equipment. Price was also a social acquaintance of Russell's. During their stay the Prices went out with petitioners, ate meals at petitioners' house, and went fishing. This pattern of activities was repeated during subsequent visits of the Prices to the St. Petersburg property. Also during 1957, petitioners entertained George Boone and his wife for dinner on one occasion. George Boone was the New York salesman for Tecumseh Products, and came to St. Petersburg to discuss a problem concerning the splitting of commissions among salesmen. Also during 1957, a Joe Layton stayed with petitioners for 4 days. Petitioner Russell Smith testified that they used the house for personal purposes for 5 weeks during 1957 and we so find. In 1958, petitioners went down from Michigan to the St. Petersburg property sometime between the first and sixth of January. They returned to Michigan in late March or early April. Petitioners *214 again entertained the Herricks, this time for 6 different days, for either lunch or dinner. Geltner and his wife were entertained on 11 nonconsecutive days. On some occasions the entertainment of the Geltners and the Herricks occurred simultaneously. Stanley Morse (hereinafter referred to as Morse) and his wife were entertained for 5 days during the 1958 season. Morse was the chief engineer for Primer Products. Jack Parsons, who was an officer of both Primer Products and Sedco, Inc., and his wife were entertained for lunch or dinner on 2 different days. Price and his wife again stayed with petitioners for a two-week period. Also during 1958, petitioners entertained as a guest for 2 days and for dinner Joe Parker (hereinafter referred to as Parker), the Atlanta salesman for Tecumseh Products. Parker and Russell discussed the problem of splitting commissions among salesmen. In 1959, petitioners went down to the St. Petersburg property in the month of February, and returned to Michigan in the month of April. During the 1959 season petitioners entertained Herrick and his wife on 6 nonconsecutive days, the Geltners on 12 nonconsecutive days, Price and his wife for 3 weeks as house guests, *215 and Boone and his wife for 1 day. Boone and Russell again discussed the split commission problem. Petitioners' next stay at the St. Petersburg property began just before Christmas of 1959, and ended in the first part of April 1960. During the 1960 season, petitioners entertained the Geltners and the Herricks on 12 nonconsecutive days. Parker and his wife were entertained for 3 days, and the split commissionn problem was again discussed. Also entertained as house guests during the 1960 season were Nick Wagner (hereinafter Wagner) and his wife. Wagner was involved in a firm which desired to sell chrome plated plastic parts to the automotive industry. Russell was considering whether to take up the account. Wagner and Russell discussed the feasibility of chrome plating plastic. Russell occupied the St. Petersburg property for 2 weeks during August 1960 while recuperating from severe burns. Just before Christmas of 1960, petitioners again journeyed to Florida, and stayed at the St. Petersburg property until late March 1961. On 11 nonconsecutive days petitioners entertained the Herricks and Geltners together. Wagner and his wife were guests of petitioners for a period of 3 days during which *216 Wagner and Russell again discussed the feasibility of chrome plating plastic. Also during the 1961 season, Morse and his wife were petitioners' guests for 2 days. Petitioners next traveled to their St. Petersburg property just before Christmas of 1961, and continued in occupancy until late March 1962. Staying with petitioners for 2 days were Parker and his wife, during which time Parker and Russell were resolving certain problems which had arisen between salesmen. Also during the 1962 season, Wagner and his wife were guests for 2 days during which negotiations relative to the chrome plated plastic were completed. From July 23 through July 29, 1962, the St. Petersburg property was occupied by Jack Finn (hereinafter referred to as Finn), his wife, and children. Finn was Russell's largest wholesale distributor. The St. Petersburg property was again occupied by petitioners for a period beginning just before Christmas, 1962, and ending with their return to Michigan in late March 1963. During the 1963 season, petitioners entertained the Herricks 11 nonconsecutive days. Also during their stay, petitioners had as house guests Malcolm Fraser and his wife. Fraser was a patent attorney who had *217 done work on many of the patents held by Russell. Also, sometime during 1963, Finn and his family again utilized the St. Petersburg property for 7 days. 192 During 1964, petitioners used the St. Petersburg property for 2 weeks. The property was not used at all during 1965. During the periods petitioners stayed at the St. Petersburg property, Russell traveled away to attend business meetings or product shows on six or seven occasions. Except for two of the occasions, Russell's wife remained in Florida. It is undisclosed as to what years these meetings and shows took place. Some of the time the St. Petersburg property was used by other persons, petitioners were not present in Florida. The property was used 3 days during one summer by petitioners' son and his family. In the fall of 1964, Russell listed the St. Petersburg property with a broker as being for sale or rent. During 1965, Russell continued to list the property for sale or rent. He changed brokers sometime in 1965 and reduced his asking price. In January 1966, petitioners traveled to Florida to sell the St. Petersburg property. Within 2 weeks of their arrival, Russell himself had sold the house and furnishings. The house with *218 furnishings was sold on February 4, 1966, for $37,500. On their 1966 Federal income tax return, petitioners, after making a reduction in basis of $8,869.32 for allowed or allowable the St. Petersburg property in the amount of $20,150.59. In a statutory notice dated March 18, 1970, respondent disallowed the claimed loss stating that "* * * it has not been established that any deductible loss was sustained during the taxable year." Respondent however changed the treatment of gain received on the sale of certain partnership property from non-capital to capital, and reflected this adjustment in the asserted deficiency. Thus, in an attempt to get full benefit of the alleged loss, petitioners here claim an overpayment in the amount of $1,057.43. Opinion Here we must determine whether petitioners, upon the sale of a residential type property in 1966, realized a loss deductible from ordinary income. The property was located in St. Petersburg, Florida, and was used by petitioners mainly during the winter season. Petitioners assert that they are entitled to the claimed deduction because the germane to Russell's trade or business as a manufacturer's representative and salesman for Tecumseh Products *219 Company. Since the claim in question concerns expenses connected with a facility purportedly used for business entertainment, petitioners must not only show that the property was used in Russell's trade or business, [2] *220 but also that the property was used primarily in furtherance of and was directly related to the active conduct of Russell's trade or business. [3] *221 Petitioners have failed to carry the 193 statutorily imposed burden because they have not demonstrated that the St. Petersburg property, as an entertainment facility, was used primarily in furtherance of Russell's trade or business, and, on the record before us, we must hold that they are not entitled to any loss deduction whatever on the sale of the property. The primary use test of section 274(a) (1)(B) necessitates there being made a comparison between the business use and nonbusiness use of the entertainment facility in question. Section 1.274-2(a)(4)(i), Income Tax Regs. The sole source of evidence for making such a comparison in this proceeding is the oral testimony given by Russell. This testimony is for the most *222 part very general, incomplete, somewhat contradictory, and totally uncorroborated. The St. Petersburg property, having been purchased in 1956 and sold in 1966, was used by petitioners for a number of years prior to the effective date of section 274, i.e., January 1, 1963. Accordingly the stringent substantiation requirements of section 274(d)[4] *223 and the regulations thereunder can not be applied in determining the incidence or facts and circumstances of business use for periods prior to January 1, 1963, although section 274 applies in determining the deductibility of the loss because the sale took place after the effective date of the section. Section 4(c), Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, 977. As to the years that the property was used by petitioners prior to 1963 we must make an estimate of the incidence of use for business entertainment based upon all the available evidence, weighing heavily against the petitioners because of the inadequacy of the evidence presented. Cohan v. Commissioner, 39 F. 2d 540, 543-44 (C.A. 2, 1930). A number of factors must be taken into consideration in making this determination. Many of the persons entertained by petitioners were close friends or social acquaintances, so it is not unlikely that some of the time spent entertaining these persons had merely a social and not a business purpose. One of the regularly recurring guests, Clyde Geltner, was in fact retired from business. There is no indication that some of the various guests enumerated in Russell's testimony were not in fact entertained on the same day. The St. Petersburg property and the entertainment *224 activities that took place there were very much of a personal nature. Cf., Richard A. Sutter 21 T.C. 170, 172 (1953). Finally there is not a great deal of evidence indicating that the entertainment during 1957 through 1962 was closely related to Russell's business in the sense of being appropriate, helpful, usual, or necessary, nor is there much evidence that the entertainment contributed to the earning of Russell's income. James Schulz, 16 T.C. 401, 406 (1951); Richard A. Sutter, supra. No claim of business use for the St. Petersburg property during 1964 through 1966 is made by petitioners. Rather the property was listed for sale during that period. Petitioners assert there was some business usage during 1963. However we can give no credence to that claim because petitioners have utterly failed to meet the substantiation requirements of section 274(d) and section 1.274-5, Income Tax Regs.[5] The only evidence of business entertainment at the St. Petersburg property during 1963 was Russell's totally uncorroborated oral statements. Clearly such evidence is not sufficient. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962) 1962-3 C.B. 707, 878; Nicholls, North Buse Co., 56 T.C. 1225, 1235 (1971). *225 Petitioners here run afoul that portion of section 1.274-5(c) (6)(iii)(b), Income Tax Regs., which provides: If a taxpayer fails to maintain adequate records concerning a facility which is likely to serve the personal purposes of the taxpayer, it shall be presumed that the use of such facility was primarily personal. 194 Because of inconsistent statements made by Russell not only as between cross examination and direct examination but during direct examination, the Court has been presented with a very wide range of figures and general estimates as to the total usage of the St. Petersburg property during each of the years in issue. Since the burden of proof rests upon the petitioners, we are inclined to place greater weight on Russell's testimony on cross examination where he gave the highest estimates of total use. Russell, on cross examination, estimated petitioners' departure from Florida in such terms as "just *226 before Christmas" or "early January." He estimated the date of departure from Florida to Michigan in terms such as "late March" or "early April." In translating these approximations to actual days of usage we have construed the estimates most beneficially to petitioners. Thus we have considered "just before Christmas" as meaning December 24, "early April" as April 1, "early January" as not later than January 12, and "late March"as not earlier than March 18. Deriving the facts as best we can from Russell's testimony, making an estimate under Cohan, supra, as to the pre-1963 business entertainment, and applying section 274(d) to post-1962 years we arrive at the following number of days of business and total usage during the years indicated: Total
Business
Year
usage
usage
1956
0
0
1957
65
23
1958
80
29
1959
55
28
1960
98
12
1961
95
16
1962
80
20
1963
75
0
1964
14
0
1965
0
0
1966 0
0
562
128
In determining the primary use of the facility, we must look to the actual use of the facility and not its mere availability. Section 1.274-2(e)(4)(i), Income Tax Regs. Consequently those years during which petitioners made no use of the St. Petersburg property are not germane in ascertaining whether the property was used primarily in *227 furtherance of Russell's business. This, however, gives petitioners little succor. The disparity between the number of days of total use and the days of business use, both in the aggregate and on a year-by-year basis, can only be described as massive. [6] Additionally the record lacks evidence as to the costs incurred by petitioners while entertaining, and while using the property for other purposes. Thus petitioners manifestly fail the test under which: The factors to be considered include the nature of each use, the frequency and duration of use for business purposes as compared with other purposes, and the amount of expenditures incurred during use for business compared with amount of expenditures incurred during use for other purposes. See also, S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 737, 874; John L. Ashby, 50 T.C. 409, 417 (1968). Since petitioners did not demonstrate that the property was primarily used in furtherance of Russell's trade or business, we hold that respondent correctly disallowed deduction of the loss realized on the sale of that property. Having so decided we find it unnecessary *228 to consider respondent's alternative contention that the loss was not deductible because the basis of the property at the time of the sale was not ascertainable. In accordance with the foregoing, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * * SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business * * *. ↩
3. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation. - (1) In general. - No deduction otherwise allowable under this chapter shall be allowed for any item - (A) Activity. - With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility. - With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.↩
4. SEC. 274(d). Substantiation Required. - No deduction shall be allowed - * * * (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * *
5. This regulation and others under sec. 274 were promulgated under a specific grant of authority contained in sec. 274(h)↩ where it is said "The Secretary or his delegate shall prescribe such regulations as he may deem necessary to carry out the purposes of this section * * *."
6. Petitioners themselves only claim 189 days of business usage.↩