LOUIS PERAINO and SORAYDA PERAINO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
PERAINO v. COMMISSIONER
Docket No. 16048-79, 16049-79.
United States Tax Court
T.C. Memo 1982-524; 1982 Tax Ct. Memo LEXIS 219; 44 T.C.M. (CCH) 1099; T.C.M. (RIA) 82524; September 14, 1982. David A. Hoines, for the petitioners. Jack H. Klinghoffer, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Additions to Tax
Docket No.
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a) [1]
16048-79
1975
$12,152
$3,038
16049-79
1974
62,596
15,649
$5,079
Concessions having been made by the parties, the issues *220 remaining for decision are 1) whether various advances made to three of petitioners' wholly owned corporations constituted business bad debts in 1974 and 1975, 2) who has the burden of proof on the above issue, and 3) whether petitioners are liable for the addition to tax under section 6653(a) in 1974. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Louis Peraino (hereinafter "Peraino" or "petitioner") and Sorayda Peraino, husband and wife, resided at Locust Valley, New York, at the time the petitions herein were filed. L.P. Music Company (hereinafter "L.P.") was a sole proprietorship owned and operated by petitioner during the years at issue. L.P. was in the business of publishing music and collecting royalties therefrom. Damiano "Loan"
In 1971, petitioner and Gerard Damiano ("Gerard") organized a New York corporation, Gerard Damiano Film Productions, Inc. (hereinafter "Damiano"). Petitioner contributed the initial capital of the corporation, $1,000, and received in return two-thirds of the corporation's stock. Gerard Damiano, who contributed his experience in the *221 movie-making business, received the remaining one-third of the corporation's shares. In 1971 and 1972, Damiano produced several low-budget X-rated movies. The movies experienced modest success. However, one Damiano movie -- "Deep Throat" -- nearing the end of its run experienced problems with the local authorities in New York City who considered the film obscene. After several highly publicized attempts to close down the theater where the film was showing in mid-1972, box office receipts for the movie began to rise and the movie was held over. Gerard, concerned about possible criminal liability for being involved with the movie "Deep Throat," pursuaded petitioner to buy out his one-third stock interest in Damiano for $15,000. Soon after petitioner had acquired all of the shares of Damiano, "Deep Throat," which had cost a mere $26,000 to film, became a sought-after property by theater owners across the country. Damiano made several million dollars (on which it paid at least one million dollars in income taxes), and petitioner, affluent as a result thereof, began to expand his operations in the music and film industry. By 1974, Damiano had sold the rights to "Deep Throat" *222 to a third party and its X-rated movie business was beginning to fall off. The corporation, however, was still profitable that year and in fact paid petitioner (who was also its president) $77,000 in wages. In 1973, petitioner formed another wholly owned motion picture corporation, Bryanston Distributors, Inc. (hereinafter "Bryanston"), to produce and distribute mostly non-X rated films. Bryanston during the years at issue either filmed or distributed several rather successful films, including "Return of the Dragon" (starring Bruce Lee), Andy Warhol's "Frankenstein" and "The Texas Chainsaw Massacre." During 1975, as petitioner's salary and activities in connection with Bryanston increased, his salaries and activity with Damiano decreased. This is illustrated by the fact that petitioner, who had no reported salary from Bryanston in 1974, reported $41,147.66 salary from that corporation in 1975. By contrast, petitioner only reported $3,000 of salary income from Damiano in 1975. By the fall of 1975, Damiano was essentially a moribund company, possessing less than $100,000 in cash (how much less is unclear) and no apparent income-producing assets. Around this time, September, *223 1975, petitioner learned of the possibility of obtaining the rights to distribute a movie of the then-imminent heavyweight boxing title fight between Muhammad Ali and Joe Frazier in the Philippines ("the thrilla in Manila"). Desiring to rejuvenate Damiano, petitioner decided to have Damiano purchase these rights, although at the time Damiano did not have the required $80,000 to $100,000 cash available. Petitioner did not seek a loan from any bank for this boxing venture because, due to adverse publicity connected with a trial involving "Deep Throat" earlier in the year, several local New York banks had declined to do business with petitioner or his corporations. Instead, in the months of September and October, 1975, Damiano received $144,000 from Bryanston, $19,000 from L.P. (on September 26), $55,000 from petitioner as an individual and $17,000 from an organization named Haunted House. [2]
Damiano initially had contracted with 600 theaters to show the Ali-Frazier fight in the weeks immediately *224 following the bout. However, on the night of the fight (September 30) attendance at theaters showing the fight by closed-circuit was only 40 to 50 percent of what had been expected. It immediately became apparent that the fight was not as popular as petitioner had expected it would be. When Damiano in October distributed the film of the fight to the theaters it had contracted with, 400 of the theaters returned the film, refusing to accept the prints. Although the theaters were contractually obligated to show the film, Damiano made no effort to enforce its rights against the theaters, deeming such a course impractical. Damiano suffered large losses as a consequence of these events. The $19,000 transfer from L.P. to Damiano was not evidenced by a note, bore no interest, was unsecured and was envisioned by petitioner as likely to be paid back in January, 1976. The transfer was recorded as a loan on the books of Damiano and L.P. No interest or principal was ever paid to L.P. on this transfer. By contrast, petitioner caused Damiano to pay back the entire $55,000 advance petitioner had made to Damiano from his individual funds; the date of this repayment has not been shown. The *225 $55,000 transfer, along with the transfers from Bryanston and Haunted House, were also recorded as loans on Damiano's books. On their 1975 joint income tax return, petitioners deducted the $19,000 transfer by L.P. to Damiano as a business bad debt incurred by L.P.
Petitioner was not in the trade or business of promoting corporations or of lending money during either 1974 or 1975. Bryan "Loan"
In February, 1974, petitioner formed another wholly owned New York corporation, Bryan Records, Inc. (hereinafter "Bryan"). Bryan was formed as a record label to promote and obtain music recording royalties and revenues from the soundtracks of films produced by Bryanston. Many of the songs included on the soundtracks owned by Bryan were written or co-written by petitioner. Since L.P. held the publishing rights to those songs and petitioner held composer royalty rights to those songs, Bryan was envisioned as "closing the circle" of revenues that could potentially be garnered from petitioners' compositions and movie making activities. Bryan's initial capitalization was $1,000. In 1974 and 1975, L.P. transferred the following amounts to Bryan to be used to pay operating expenses *226 of Bryan: Date
Amount
May 16, 1974
$4,000
June 14, 1974
6,500
December 18, 1974
5,000
March 24, 1975
125
May 9, 1975
6,000
Each of these transfers was noted both in L.P.'s checkbook and ledgers and Bryan's ledgers as a loan. Such transfers were not evidenced by a note, bore no interest, were unsecured and were expected to be paid back within a year. In addition to the above transfers, L.P. paid various third parties for promotional services, record pressing and production costs connected with the business of Bryan. These payments were accompanied by notes in L.P.'s checkbook indicating that Bryan should be charged for the expenditures. Bryan did not make these payments itself because there were no funds at the time in its corporate checking account. The payments by L.P. were as follows: Date
Amount
Remarks
April 25, 1975
$320.03
postage & flyers
April 25, 1975
700.00
record pressing
April 25, 1975
600.00
production cast
April 25, 1975
1,276.00
recording studio
April 25, 1975
763.61
promotion expenses
May 2, 1975
2,500.00
advance against royalties
May 2, 1975
600.00
promotion fee
May 2, 1975
1,200.00
promotion fee
*227 Unlike the prior transfers, these payments were not recorded as loans on the books of Bryan. L.P.'s books, however, did treat these payments as loans to Bryan. During 1974 and 1975, Bryan records owned the soundtrack rights to at least three Bryanston-produced movies, "Deep Throat, Part II" (Rated R), "The Last Porno Flick" (Rated PG) and "Lord Shango" (Rated R). "Lord Shango" was filmed in 1975. Most of the expenses of recording and manufacturing demonstration records of these soundtracks had already been paid for by Bryanston through its movie production budget. In fact, Bryan did not intend to manufacture soundtrack records itself. Rather, Bryan hoped that if the Bryanston movies to which its soundtracks belonged became a success, Bryan could enter into lucrative contracts with major record label companies allowing the latter to actually manufacture and distribute the soundtrack records. Consequently, Bryan's expenses consisted primarily of promotional expenses incurred to publicize and distribute its demonstration records to disc jockeys and major record label companies. While many of these expenses were already paid by Bryanston in its movie production budget, it is *228 clear from the amounts spent by L.P. on Bryan's behalf in April and May, 1975, that Bryan did have substantial promotional expenses which were not picked up by Bryanston. Further, beginning in late 1974, Bryan sought out artists not connected with Bryanston films in an attempt to broaden the revenue base of Bryan and make it a more important record label. Very early in this effort Polidor Records of Canada aid Bryan a $10,000 advance for the right to distribute any future artist signed by Bryan. Bryan experienced little or no success with its Bryanston movie soundtracks. Despite high hopes (especially connected with "Lord Shango" in 1975), none of the Bryanston films generated much box office interest. As a result, none of the Bryanston movie soundtracks ever went into commercial production. Bryan never reimbursed L.P. for either the transfers or payments discussed above. On their 1974 income tax return, petitioners deducted the $15,500 of transfers made by L.P. to Bryan that year as business bad debts of L.P. On their 1975 income tax return, petitioners deducted $14,084.64, consisting of transfers of $6,125 from L.P. to Bryan and $7,959.64 of payments made by L.P. on *229 behalf of Bryan that year, as business bad debts of L.P.
Battersea "Loan"
Battersea Holdings, Inc. (hereinafter "Battersea") was still another New York corporation wholly owned by petitioner during the years at issue. Battersea was formed for the purpose of lending money to third parties at interest. Battersea was initially capitalized with $1,000. Battersea obtained funds both from petitioner and other third parties and then lent the funds primarily to other individuals and unaffiliated businesses. On November 29, 1973, L.P. transferred $35,000 to Battersea. On December 7, 1973, L.P. transferred an additional $20,000 to Battersea. These two transfers were characterized as loans, both on the books of Battersea and L.P. Though petitioner envisioned the "loans" as being made at a rate of interest of one percent per month, payable monthly, and expected the transfers to be paid back between 18 months and two years, no note to this effect was ever drawn up. Neither was the transfer secured by any collateral. Payments denominated interest on Battersea's and L.P.'s books were made by Battersea to L.P. as follows: Date
Payment
July 16, 1974
$550
August 26, 1974
550
October 7, 1974
4,400
January 15, 1975
550
*230 On their 1975 Schedule C for L.P., petitioners reported the $550 payment received by L.P. that year as interest income. As of December 31, 1974, the receivables of Battersea were approximately $320,000.These receivables represented loans by Battersea to twenty individuals or entities. Battersea's loans payable on that date were as follows: World Wide
$215,000
L.P.
55,000
Bryanston
20,000
Damiano
9,000
Total
$299,000
Battersea eventually sued seven of its twenty debtors (representing $100,000 of the $320,000 of total receivables) in an effort to collect its loans. In one instance, Battersea attempted to recover on a $35,000 loan to a furniture company, but learned that its security interest in the collateral for the loan had not been perfected in a timely manner by its lawyer. Though Peraino was advised that a suit for malpractice might lie against Battersea's attorney, no suit was ever instituted. Battersea ceased doing business in April 1975. At that point various of its loans payable were paid off, with a preference being given for non-Peraino-owned creditors. L.P. received no repayment of its $55,000 transfers. On their 1974 income *231 tax returns, petitioners deducted the $55,000 worth of transfers by L.P. to Battersea as business bad debts of L.P.
Negligence Addition
In filling out their 1974 income tax return, petitioners relied on their accountant, who held a B.S. degree in accounting from New York University, to prepare their returns accurately. For this purpose, the books and records of petitioner's various proprietorships and corporations were all made available to the accountant. In establishing his various corporations with an initial capital of $1,000 and thereafter treating all transfers to such corporations a loans, petitioner relied on the advice of Frank Avianca, a person with extensive background in both the music and film industries, that such a capital structure was both common and proper. Petitioners have conceded the receipt of $1,833 of constructive dividends and $5,336.36 of other income, all unreported, in the taxable year 1974. OPINION The first issue for decision is who shoulders the burden of proof on the bad debt issues. On a page entitled "Statement - Income Tax Changes" (Form 5278) contained in respondent's statutory notice of deficiency dated August 20, 1979, respondent, *232 among other things, made the following adjustments to petitioners' income: Tax Years Ended
Adjustments to Income
12/31/74
12/31/75
a. Constructive Dividends
$7,113.92
$7,578.25
b. Schedule "C" Bad Debts
70,500.00
34,084.64
On a succeeding page entitled "Explanation of Adjustments," respondent wrote the following: (a) It is determined that you realized unreported taxable income from constructive dividends from various corporations for the years ended December 31, 1974 and December 31, 1975 computed as follows: Name of Corporation
1974
1975
Beaumont Film Production Inc.
$2,685.67
Bryanston Distribution, Inc.
4,428.25
7,578.25
Increase in income
$7,113.92
$7,578.25
(b) It is determined that you realized unreported taxable income from constructive dividends from various corporations for the years ended December 31, 1975 [sic] computed as follows: Name of Corporation
1974
1975
Ridgeway Inc.
$1,000.00
Bryan Records, Inc.
15,500.00
14,084.64
Battersea Holding, Inc.
55,000.00
G. Damiano Film Production, Inc.
19,000.00
Increase to income
$70,500.00
$34,084.64
In their petitions, petitioners *233 alleged that the respondent erroneously increased their taxable income by the amounts indicated in (b) of the statutory notice, "erroneously characterizing the same to be a constructive dividend." Petitioners also stated: Such amounts constitute ordinary and necessary business expenses of the aforesaid Corporations [mentioned in adjustment (b)], and are consequently appropriately deducted by the aforesaid Corporations and not taxable income to Petitioners, or was [sic] paid by Petitioners either to the Corporations or on behalf of the Corporations for their ordinary and necessary business expenses. In his answers filed January 21, 1980, respondent admitted that "the Commissioner asserted that petitioners realized taxable income from constructive dividends" as detailed in adjustment (b) of the statutory notice, but denied petitioners' further allegations in connection with those adjustments. By an amended answer filed the date of trial, April 23, 1981, respondent alleged that the items noted in adjustment (b) were in fact disallowed as bad debt deductions because (1) petitioners have not substantiated that the "loans" were made; (2) the "loans" were in fact contributions *234 to capital; -- if it is determined that the money paid constituted debts; (3) petitioners have not established that the debts became worthless in the taxable year; and (4) petitioners have not established that the debts were "business" bad debts. In a motion for leave to file the above-mentioned amended answer, respondent explained that in preparing the statutory notice, he had inadvertently used the same text in explaining adjustments (a) and (b), though the breakdown of corporations and disallowed amounts in adjustment (b) was accurate. Respondent further stated: 1) that at the Appeals Division of the I.R.S., the disallowances in (b) had been discussed with petitioners' counsel as bad debts; 2) that a letter from respondent to petitioners dated January 26, 1981, referred to the disallowances in (b) as "bad debts" and requested information and documentation concerning the issues of substantiation, worthlessness, thin capitalization and the claimed "business" nature of the alleged bad debts; and 3) that a conference on the subject of these bad debt issues was held between petitioners' attorney and respondent on March 13, 1981. Petitioner, at trial, neither opposed respondent's *235 motion, contradicted the statements made in the motion, nor claimed surprise in regard to the amended answer's allegations. Petitioner argues that under Rule 142(a), [3] the respondent has pleaded new matter in his amended answer and thus must bear the burden of proof. Respondent contends that he merely cleared up obvious confusion in the statutory notice and that petitioner is not surprised by the clarification; therefore petitioner, as is usual, should bear the burden of proof. We agree with respondent. Certainly, if the respondent had uniformly throughout the statutory notice and his pleadings disallowed the items in adjustment (b) of the statutory notice *236 as not meeting the requirements for the deduction of "Schedule 'C' Bad debts," his words would have been sufficiently broad to entitle him to the presumption of correctness on each of the more specific theories of the amended answer. Mills v. Commissioner,399 F.2d 744, 748 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Sorin v. Commissioner,29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). Here, however, the respondent stated two different theories relating to adjustment (b) in the statutory notice: business bad debt and constructive dividend. These theories are obviously inconsistent, the first involving the disallowance of a deduction and the second involving the failure to report an income item. Respondent then compounded his mistake by admitting in his original answer that the erroneous theory (constructive dividend) was at issue. Respondent has since clarified his position by an amended answer in which he stated that the items in adjustment (b) were actually disallowed solely on business bad debt deduction grounds. Does respondent's conduct require that the burden of proof be shifted? We think *237 not. While matters of pleading are certainly important and not to be taken casually, they also must not be taken overly literally. [4] There must be a certain amount of play in the joints of the pleading rules to cover obvious typographical errors which do not result in surprise when corrected sufficiently before trial. We think this is such a case. Petitioners were aware of respondent's bad debt deduction theory at the appellate level of the I.R.S., were aware that the sums of money and corporations involved in the detailed explanation of adjustment (b) corresponded to their claimed bad debt deductions, were aware that at least in part of the statutory *238 notice adjustment (b) was denominated "Schedule 'C' Bad debts" and were aware of the true theory of respondent's case well in advance of the trial. Petitioners have cited us no case in which, on similar facts, this Court has shifted the burden of proof to respondent. Nor have they cited any policy reason why the burden of proof should shift in this case. Respondent in fact determined his deficiency on the bad debt theory, even if he did not articulate this very well in the statutory notice; this was not some theory thought up after the fact to justify a deficiency determined on some other basis. Compare Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1241 (1971); Papineau v. Commissioner,28 T.C. 54, 57 (1957); Tauber v. Commissioner,24 T.C. 179, 185 (1955). Consequently, respondent has not pleaded new matter and need not bear the burden of proof. In connection with the claimed Damiano, Bryan and Battersea business bad debts, [5] respondent argues 1) that petitioners have failed to establish any money transfers which could be the basis of a debt, 2) that any transfers made could only be contributions to capital *239 and not bona fide loans, 3) that petitioners have not shown these "debts" to have become worthless in the years claimed, and 4) that in no case were these "debts" business bad debts. Petitioners, on the other hand, contend 1) that transfers did occur, 2) that these were intended to be loans, 3) that they were treated accordingly on the various corporate and proprietorship books and 4) that these business-related debts were property deemed worthless in the years the corresponding deductions therefor were claimed. Petitioners also argue that respondent is estopped from recharacterizing the Battersea loans as capital contributions because petitioners reported interest income therefrom in 1974 and 1975 (which respondent has not recharacterized) and because respondent audited Battersea in 1973 and did not disallow any of that corporation's interest deductions. We will deal with each corporation separately: Damiano
Notwithstanding respondent's objections, we were convinced by the testimony of petitioners' witnesses *240 that transfers of money to Damiano, Bryan and Battersea did occur as petitioners allege. In the case of Damiano, however, we agree with respondent that such transfers could not give rise to business bad debt deductions because 1) the transfers were in the nature of capital contributions, not loans, and 2) in any case, if loans, petitioners have not shown the year of worthlessness to be 1975. A multitude of cases have attempted to set standards for determining the debt-equity issue. Among the factors courts generally consider are: (1) The intent of the parties; (2) The identity between creditors and shareholders; (3) The extent of participation in management by the holder of the instrument; (4) The ability of the corporation to obtain funds from outside sources; (5) The "thinness" of the capital structure in relation to debt; (6) The risk involved; (7) The formal indicia of the arrangement; (8) The relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) The voting power of the holder of the instrument; (10) The provision *241 of a fixed rate of interest; (11) A contingency on the obligation to repay; (12) The source of the interest payments; (13) The presence or absence of a fixed maturity date; (14) A provision for redemption by the corporation; (15) A provision for redemption at the option of the holder; and (16) The timing of the advance with reference to the organization of the corporation. See Fin Hay Realty Co. v. United States,398 F.2d 694, 696 (3d Cir. 1968), and cases cited therein. As the Court of Appeals recognized in Fin Hay Realty, however, [t]he various factors which have been identified in the case are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship. [398 F.2d at 697 (footnote reference omitted).] See also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.04, p. 4-10 (4th ed. 1979). In the instant case, no extended analysis is necessary for us to reach the conclusion that the transfer herein was *242 capital in nature. First, there was complete identity between the transferors and the stockholders of Damiano, a situation inviting special scrutiny. P.M. Finance Corp. v. Commissioner,302 F.2d 786, 788-789 (3d Cir. 1962). Second, the transfer was evidenced by no note, had no specific terms of repayment, bore no interest and was totally unsecured. Third, Damiano was basically a non-income-producing corporate shell at the time of the transfer. Money transferred from L.P. and corporations controlled by petitioner was to be used by Damiano to purchase the rights to a film of the Ali-Frazier fight in the Philippines and to distribute that film. If the film was a box office success, no doubt L.P. would be repaid, but if the film was a box office failure Damiano would apparently have few valuable assets against which L.P., as a creditor, could levy. The L.P. money was clearly put at the complete risk of Damiano's sole speculative venture. See Gilbert v. Commissioner,248 F.2d 399, 406-407 (2d Cir. 1957); Schnitzer v. Commissioner,13 T.C. 43, 61-62 (1949), affd. per curiam 183 F.2d 70 (9th Cir. 1950). Finally, the *243 corporation was clearly inadequately capitalized. Damiano's initial capitalization was only $1,000. [6] By October 1975, due to transfers not only from L.P., but several other corporations owned by petitioner, Damiano showed loans payable of at least $235,500. By contrast petitioners argue that they intended the transfer to be a loan and that the books of both L.P. and Damiano reflect this understanding. While these are relevant factors in a debt-equity inquiry they are not in themselves sufficient to convert what by all objective standards would be considered a capital contribution into a loan (especially when Damiano's formal treatment of the transfer was a by-product of the control petitioners exercised over that corporation). See Gilbert v. Commissioner,supra at 402 ("the mere empty form of the transaction does not preclude further inquiry"). A second reason for disallowing petitioners' business bad debt deduction for the Damiano transfer is that, even if they had shown the transfer to have been a loan, petitioners have *244 failed to show that that loan became wholly worthless by the end of 1975. Damiano's books reflected at least $235,500 of loans payable at the end of October, 1975. All this money had been received by the corporation in September or October of that year. Petitioner did not explain where all of the money went. At most, according to petitioner, $100,000 was paid for the film rights to the fight. This leaves a substantial amount which could have been used to pay back the L.P. loan, at least in part. In fact, petitioner admitted at trial that one loan on Damiano's books, a $55,000 loan from petitioner's individual funds, was eventually repaid in full. The year of this repayment was not stated. How Damiano could fully repay one debt to petitioner and yet not repay anything on another, almost simultaneously created, debt to petitioner doing business as L.P. was unexplained. Apparently, both such loans were equally unsecured. At most, then, we think the L.P. loan was rendered partially worthless by the box office failure of the fight movie in 1975. [7] But no deduction for partial worthlessness, even of a business debt, is allowable absent the consent of respondent. Section 166(a)(2); *245 section 1.166-3(a)(2), Income Tax Regs.
Petitioners having failed to meet their burden of proof regarding the Damiano transfer, respondent's disallowance is upheld. [8]
*246 Bryan
We also agree with respondent's disallowance of business bad debt deductions of $15,500 in 1974 and $14,084.64 in 1975 relating to transfers by L.P. to Bryan and payments made by L.P. on behalf of Bryan. Petitioners have not shown these items to have been loans as opposed to capital contributions; nor have they shown these items to have been wholly worthless in the years claimed. We find these items to be equity contributions for much the same reasons we did in the case of the Damiano transfer. Petitioners wholly owned Bryan, the transfers and payments were evidenced by no notes, had no specific terms of repayment, bore no interest and were totally unsecured. Fin Hay Realty Co. v. United States,supra.Bryan was grossly undercapitalized with $1,000 on formation and used all the L.P. funds merely to meet its operating expenses in promoting its soundtrack albums and signing new artists. The money was put at the complete risk of speculative ventures. See Gilbert v. Commissioner,supra.With regard to the $7,959.64 of payments made by L.P. on Bryan's behalf in 1975, Bryan's books did not even contain a loan payable entry. *247 Petitioners have also failed to show that even if these items did constitute debts, they became totally worthless in 1974 and 1975. First, it is unclear that at the end of 1974 petitioners had no hope of recovering the amounts advanced. Although Bryan had experienced little success in promoting its Bryanston movie soundtracks, petitioner's accountant admitted at trial that the company had hopes of collecting some money owed to it by distributors. (Petitioners elicited no testimony regarding the size of these Bryan receivables.) Additionally, petitioners transferred $5,000 to Bryan on December 18, 1974. Petitioners seek to deduct this transfer as worthless only 13 days after it was made, though they presented no evidence that any intervening event made inevitable such uncollectability. We think it highly unlikely that a taxpayer would loan money to a wholly owned corporation which was defunct or soon to become defunct in a matter of days. Second, petitioners have presented insufficient evidence to show their 1975 transfers and payments, if creating debts, were worthless as of December 31, 1975. Petitioners made numerous transfers to Bryan and payments on behalf of Bryan *248 between March and May, 1975. These items were all apparently connected to the recording and promotion of a film soundtrack to a Bryanston movie, "Lord Shango." Petitioners testified that "Lord Shango" was a critical success but a box office failure and that consequently Bryan could not repay L.P. the moneys at issue. Petitioners, however, gave no specifics about when this movie was first released, when its failure became apparent, what receivables, if any, Bryan possessed at the end of 1975 (both as to amount and likelihood of ultimate receipt) of the market value of the assets, if any, Bryan had on hand at that time. Petitioners merely testified that they satisfied themselves that they would never collect on these Bryan transfers and payments at the end of 1975. Such conclusory testimony, unsupported by objective facts, is insufficient to meet petitioners' burden of proof on the issue of worthlessness. Battersea
We further agree with respondent that the 1973 transfers to Battersea are not deductible as business bad debts in 1974 because, whether or not these transfers were debts, they were not business-related debts and petitioners have failed to prove their worthlessness *249 as of December 31, 1974. [9]
Battersea was in the business of lending money. Petitioner, concededly, was not. Neither was petitioner a promoter of corporations as items of inventory; see Whipple v. Commissioner,373 U.S. 193 (1963); nor a salaried employee of Battersea. See United States v. Generes,405 U.S. 93 (1972). Accordingly, even if the transfers constituted debts they were nonbusiness debts. Petitioners, however, have failed to show these purported loans were wholly worthless at the end of 1974. Battersea was still a functioning corporation at least as late as April, 1975. Interest was paid on the transfers during January, 1975. Its books reflected receivables of $320,000 at the end of 1974 and loans payable of $299,000. Although largely unsuccessful litigation involving seven debtors and $100,000 of receivables was eventually brought, petitioners have not indicated that these lawsuits were futile, or were even begun, by the end of 1974. The remaining receivables *250 were apparently all collectible. On this record, therefore, it appears there was a significant chance that petitioners would recover all or part of their transfer to Battersea at the end of 1974. Accordingly, no bad debt deduction was allowable in that year. Negligence Addition
The final issue for decision is whether petitioners are liable for an addition to tax under section 6653(a) for the year 1974. Petitioners have conceded their failure to report constructive dividends of $1,833 and other income of $5,336.36 in 1974. We have also found that they improperly deducted $70,500 as business bad debts in that year. Petitioners contend that they relied on their accountant to prepare their returns accurately from their books and that they set up the capital structures of their wholly owned corporations on the advice of an individual with extensive background in the music and film industries. This testimony might have been sufficient to absolve petitioners of negligence if the only items on which the addition was based were the bad debt deductions; see Hill v. Commissioner,63 T.C. 225, 251-252 (1974), affd. without published opinion sub nom. Tenner v. Commissioner,551 F.2d 313 (9th Cir. 1977); *251 however it fails to explain the over $7,000 in unreported income on which the negligence addition was also based. Petitioners have simply failed to introduce any evidence on the subject of why these constructive dividends and other income items (described in the deficiency notice as improperly diverted receipts of Damiano) were not reported in 1974. They have not shown that their accountant was possessed of any information regarding these unreported income items. See Johnson v. Commissioner,74 T.C. 89, 97 (1980), affd. on another issue 673 F.2d 262 (9th Cir. 1982). Accordingly, petitioners have not met their burden of proof on this issue, and the addition should be imposed. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years before the Court.↩
2. The record is silent as to whether Haunted House was another one of petitioner's proprietorships or wholly owned corporations or whether it was an unaffiliated organization.↩
3. All references to Rules are to the Tax Court Rules of Practice and Procedure.
Rule 142(a) provides: (a) General: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent. As to affirmative defenses, see Rule 39.↩
4. Indeed, if we wanted to be excessively literal about the notice of deficiency and the pleadings, we could point out that respondent apparently asserted two different theories in connection with the items in adjustment (b) of the notice: constructive dividends and bad debts. Since the petition makes no mention of the bad debt theory and does not allege error in regard to that theory of the adjustment, it could be argued that petitioners had conceded the bad debt issue and no trial was necessary. We do not so hold, however.↩
5. Petitioners have conceded the issue of the $1,000 Ridgeway, Inc. 1975 business bad debt also disallowed in respondent's adjustment (b) of the statutory notice.↩
6. Petitioners introduced no evidence to show that Damiano's equity account was any higher at the time of the L.P. transfer.↩
7. Petitioner's testimony regarding the circumstances of the fight and the box office failure of the movie left much to be desired. Petitioner's testimony in this regard could best be described as impressionistic: few facts were given, and at least one rather significant fact, the location of the fight, was incorrectly stated by petitioner. Petitioner testified that the film was to be of an Ali-Frazier fight in Zaire. Petitioner's attorney and accountant correctly noted that the fight was an Ali-Frazier fight in the Philippines ("the thrilla in Manila"). In fact, the heavyweight title fight that occurred in Zaire ("the rumble in the jungle") was between Ali and George Foreman and took place October 30, 1974. See M. Ali, The Greatest: My Own Story, 14 (1975).↩
8. Petitioners argue that respondent's reliance merely on the cross-examination of petitioners' witnesses as his case in chief fails to meet the respondent's burden of going forward with evidence to rebut petitioners' evidence. This, they believe, entitles them to prevail herein. Petitioners confuse the burden of proof with the burden of going forward. Petitioners have the ultimate burden of proof to present sufficient credible evidence entitling them to a bad debt deduction. If petitioners, as they have here, present insufficient evidence on their own to entitle them to a deduction as a matter of law, respondent need not put in rebutting evidence to prevail. See Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. In any event, rebutting evidence adduced by cross-examination may properly form the basis of respondent's case. This commonly occurs in fraud cases, where respondent, and not the taxpayer, bears the burden of proof.↩
9. Holding as we do, we need not reach petitioners' argument that respondent is estopped from recharacterizing the transfers from loans to contributions to capital.↩