OLAF C. AKLAND and BERTHA K. AKLAND, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Akland v. Commissioner
Docket Nos. 4898-80, 4899-80, 7256-81, 18926-81, 18927-81, 18928-81.
United States Tax Court
T.C. Memo 1983-249; 1983 Tax Ct. Memo LEXIS 536; 46 T.C.M. (CCH) 51; T.C.M. (RIA) 83249; May 5, 1983. Michael R. Pinatelli, Jr., for the petitioners. Robert E. Casey, for the respondent. DAWSON
MEMORANDUM FONDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Fred S. Gilbert, Jr., pursuant to the provisions of section 7456(c) of the Internal Revenue Code *539 [2] and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[3] The Court agrees with and adopts his opinion which is set forth below. OPONION OF THE SPECIAL TRIAL JUDGE GILBERT, Special Trial Judge: In these consolidated cases, respondent determined deficiencies in Federal income taxes and additions to tax against the individual and corporate petitioners as follows: Taxable
Additions to Tax
Petitioner
Docket No.
Years
Deficiency
Sec.6653(a)
Sec.6653(b)
Olaf C. & Bertha K.
Akland
4898-80
1976
$ 3,664
$183
1977
$ 1,856
$ 93
1978
$ 1,962
$ 98
18927-81
1979
$47,181
$23,590
Curtis C. & Arden A.
Akland
18926-81
1976
$18,516
$ 9,258
1977
$44,022
$22,011
1978
$35,872
$17,936
1979
$51,248
$25,624
Akland Irrigation
Company, Inc.
4899-80
1976
$ 3,562
$178
7256-81
1977
$38,693
$19,346
18928-81
1978
$34,130
$17,065
1979
$39,683
$19,842
*540 By answers in docket Nos. 18926-81, 7256-81, and 18928-81, respondent alleged, in the alternative, that to the extent that any underpayment of tax was not due to fraud any underpayment of tax was due to negligence. Accordingly, respondent asserted that petitioners Curtis C. and Arden A. Akland and petitioner Akland Irrigation Company, Inc., were liable for additions to tax under section 6653(a) with respect to the years at issue in those cases. In amended answers in docket Nos. 4898-80, 18927-81, and 4899-80, respondent alleged and claimed increased deficiencies, increased additions to tax and additions to tax as follows: Taxable
Increased
Petitioner
Docket No.
Years
Deficiency
Olaf C. &
Bertha K.
Akland
4898-80
1976
$16,237.36
1977
$39,751.00
1978
$35,586.00
18927-81
1979
$ 6,969.00
Akland
Irrigation
Co., Inc.
4899-80
1976
$17,439.68
Increased
Additions to Tax
Additions to Tax
Petitioner § 6653(a) § 6653(b) § 6653(b)
Olaf C. &
Bertha K.
Akland
$ 811.87
$ 9,950.68
$1,987.55
$20,804.00
$1,779.30
$18,774.00
$3,484.50
Akland
Irrigation
Co., Inc.
$ 872.08
$10,500.84
*541 After one concession by respondent, [4] the issues presented for our decision are: (1) Whether petitioner Akland Irrigation Company, Inc., is entitled to include in its cost of goods sold certain "payments" made for goods allegedly purchased from, or services allegedly rendered by, two pruported "common law business trusts;" (2) whether petitioners Olaf C. Akland and Curtis C. Akland, shareholders of Akland Irrigation Company, Inc., received constructive dividends as a result of those "payments," and, if so, the amount of such dividends; (3) whether certain dividend and interest income reported as earned by a purported "common law business trust" is taxable to petitioners Olaf C. and Bertha K. Akland; (4) whether petitioner Akland Irrigation Company, Inc., is entitled to deduct, under section 162, $6,000 paid in 1976 to obtain a package of materials relating to the formation and operation of "common law business trusts;" (5) whether petitioner Olaf C. Akland received a constructive dividend as a result of that $6,000 payment; and (6) whether the corporate and individual petitioners are liable for additions to tax under section 6653(a) for negligence or, alternatively, whether the *542 corporate and individual petitioners are liable for additions to tax under section 6653(b) for fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Olaf C. Akland ("Olaf") and Bertha K. Akland ("Bertha"), husband and wife, and petitioners Curtis C. Akland ("Curtis") and Arden A. Akland ("Arden"), husband and wife, resided in Yakima, Washington, at the time their petitions were filed with this Court. Both couples (hereinafter sometimes collectively referred to as the individual petitioners or simply the petitioners) filed timely joint Federal income tax returns for the calendar years 1976 through 1979 with the Internal Revenue Service Center in Ogden, Utah. Petitioner Akland Irrigation Company, Inc. (hereinafter "Akland Irrigation" or the corporation), a corporation organized and operated under the laws of *543 the State of Washington, maintained its office and principal place of business in Yakima, Washington, when its petitions were filed. The corporation filed timely Federal corporate income tax returns for the fiscal years ended October 31, 1976, October 31, 1977, October 31, 1978, and October 31, 1979, with the Internal Revenue Service Center in Ogden, Utah. Akland Irrigation was founded in 1961 by Olaf. At all times material herein, the corporation was engaged in the business of designing, selling, installing, and repairing agricultural and residential irrigation systems and pumps. During all of the years at issue, Olaf was the president of Akland Irrigation, Curtis was the corporation's vice-president, and Bertha served as the corporation's secretary-treasurer. Olaf owned 60 per cent of the common stock of Akland Irrigation and worked for the corporation on a part-time basis; Curtis owned the remaining 40 per cent of the common stock and managed the day-to-day operations of the corporation. As of the date of the trial, Akland Irrigation had approximately 25 full-time employees. Curtis is the son of Olaf and Bertha. He graduated from high school and studied engineering for *544 five years prior to joining his father at Akland Irrigation in 1968. On October 1 and 2, 1976, Olaf, Curtis, and Ralph V. Thomas ("Thomas"), a high school teacher who performed various bookkeeping functions for Akland Irrigation, attended a two-day seminar conducted by Karl L. Dahlstrom ("Dahlstrom") of the American Law Association ("ALA"). The fee charged for the seminar was $6,000. Curtis drew a check for $6,000 against the checking account of the corporation and paid this amount to the American Law Education Society ("ALES"), the Washington chapter of the ALA, in satisfaction of the fee. At the seminar, Dahlstrom lectured to approximately 20 persons on the formation and operation of so-called "foreign business trust organizations." Dahlstrom and others associated with the ALA also referred to these organizations as "pure trusts," "common-law business trusts," or "Massachusetts business trusts." [5] Throughout the seminar, Dahlstrom represented that a taxpayer utilizing business trusts organized in either the Turks and Caicos Islands, British West Indies, or the country of Belize (formerly British Honduras), could legally minimize or altogether avoid the payment of Federal *545 taxes. In this regard, the seminar participants were supplied with a package of materials consisting of preprinted forms relating to the formation of business trusts. The package also contained photocopies of numerous court opinions and articles from various periodicals and journals relating to business trusts. After reviewing these materials, Olaf and Curtis conferred with Thomas and decided to establish a number of business trusts for the benefit of themselves and Akland Irrigation. *546 Curtis and Olaf made photocopies of the business trust forms which they received at the ALA seminar and prepared several sets of these forms for execution. Curtis then traveled to Grand Turk, an island in the Turks and Caicos Islands, for the purpose of executing these documents. Olaf did not travel to Grand Turk but instead gave Curtis a general power of attorney to act on his behalf in executing the documents. Thomas accompanied Curtis to Grand Turk for the purpose of establishing his own business trusts to be utilized in connection with his bookkeeping business. When they arrived at Grand Turk, Curtis and Thomas met Evan Missick ("Missick"), the owner of the hotel where Curtis and Thomas stayed while on the island. Missick later introduced Curtis and Thomas to Alexander Adams ("Adams"), a notary public on the island of Grand Turk. Neither Curtis or Thomas had previously met or known Missick or Adams. Olaf has never communicated with either Missick or Adams. On October 18, 1976, Curtis, Missick, and Adams met at Adams' office on Grand Turk and executed the business trust documents which Curtis and Olaf had prepared prior to the meeting. With the execution of these *547 documents, two groups of business trust organizations were purportedly established in the Turks and Caicos Islands. Curtis and Olaf named the trusts in the first group A.K. Land Company ("A. K. Land"), Delta Industries ("Delta"), Triangle Industries ("Triangle"), and Karolina Industries ("Karolina"). They named the trusts which comprised the second group Denhoff Industries ("Denhoff"), Sheridan Company ("Sheridan"), and Oleba Company ("Oleba"). Curtis and Missick executed instruments entitled "Contract & Declaration of Trust" for each of the seven business trust organizations; their signatures were notarized by Adams. Attached to each declaration of trust are minutes which describe the steps taken to establish each trust, and a trust certificate, representing 100 beneficial units of the trust, which identifies the owner or owners of the beneficial interest in the trust. When read together, these documents purport to show that each trust was established as follows: A "transferor" (Curtis, Olaf, or a previously established trust) purportedly conveyed certain property to Missick, the nominal "creator" of each of the seven trusts, in exchange for a trust certificate evidencing ownership *548 of the beneficial interest in the trust. Missick then appointed the transferor or a previously established trust as first trustee of the trust and the property originally conveyed to Missick was immediately reconveyed to the trustee. [6]
The declarations of trust expressly provided that the first trustee could appoint a second trustee and that, with respect to the property conveyed to them as trustees, they would "act as absolute owners and hold title as joint tenants in fee simple." As to the powers of trustees, the instruments provided that "resolutions of the board of trustees authorizing a special thing to be done shall be evidence that such an act is within its power." The duration of each trust was stated to be 25 years, but it was within the discretion of the trustees to terminate the trust at an earlier date. In the event the trust was terminated, the owners of the beneficial units of each trust were entitled to a pro rata distribution *549 of the trust assets. Other than this right, the owners of the beneficial units held only the right to receive income of the trust when distributed at the discretion of the trustees. As a result of these provisions, the trustees exercised complete dominion and control over the trusts and were authorized in their sole discretion to distribute trust income to anyone, including themselves. The first set of trust documents executed by Curtis and Missick purport to establish A. K. Land. These documents recite that the transferor (Curtis) transferred $105 to the creator (Missick) in exchange for 100 trust certificate units of A. K. Land, and that Missick appointed Curtis as first trustee. Olaf was later named second trustee of A. K. Land and given 50 of the trust's 100 trust certificate units. The next set of documents purport to establish Delta. These documents recite that A. K. Land transferred $100 to Missick in exchange for 100 trust certificate units of Delta. (Curtis signed the documents as trustee of A. K. Land.) The documents indicate that A. K. Land later gratuitously transferred 50 trust units to Curtis and 50 trust units to Olaf. In 1977, Curtis and Olaf gave these *550 units back to A. K. Land. The documents which purport to establish Karolina and Triangle state that with respect to each trust Curtis transferred $200 to Missick in exchange for the 100 trust units of each trust. A.K. Land was appointed first trustee of both trusts and Curtis transferred the trust units of both Karolina and Triangle to Delta. In forming the second group of business trusts, Curtis executed the trust documents for Olaf by way of a temporary power of attorney. The first set of documents executed on behalf of Olaf purport to establish Denhoff. These documents state that Olaf transferred $205 to Missick in exchange for 100 trust units of Denhoff and that Missick appointed Olaf as first trustee of Denhoff. Olaf later gave 50 trust units of Denhoff to Bertha and appointed Bertha second trustee of that organization. The documents which purport to establish Sheridan recite that Denhoff transferred $200 to Missick in exchange for 100 trust units of Sheridan. (These documents were signed for Olaf as trustee of Denhoff.) Denhoff was appointed first trustee of Sheridan. The trust units of Sheridan were initially conveyed to Olaf and Bertha, then later reconveyed *551 to Denhoff in 1977. Oleba was the final business trust purportedly established by Olaf. The documents which purport to establish that entity state that, in exchange for 100 trust units of Oleba, Olaf ostensibly transferred the following property to Missick: (1) $250; (2) all 350 shares of the preferred stock of Akland Irrigation; and (3) two parcels of unimproved real property, one situated in El Centro, California, and the other in Sheridan County, North Dakota. [7] Denhoff was appointed trustee of Oleba, and Olaf gave 50 of the Oleba trust certificate units to Bertha. It should be emphasized that, although all of the trust documents refer to Missick as the "creator" of the seven trusts, Missick never purported to transfer any property to the trusts and he never held any property for Curtis or Olaf for more than a theoretical *552 instant. No persons other than the individual petitioners held any interest in, or had any control over, the business trusts. Curtis left Grand Turk with all of the trust documents, and with all of the cash that was ostensibly transferred either to Missick or between the trusts. Shortly after Curtis returned to the United States, Olaf, Bertha, and Curtis opened bank accounts in the names of the business trusts as follows: (1) Delta -- Peoples National Bank, Seattle, Washington; (2) Karolina -- United States National Bank of Oregon, Portland, Oregon; (3) Triangle[8] -- Seattle Trust & Savings, Seattle, Washington; (4) Sheridan -- Seattle First National Bank, Union Gap, Washington; and (5) Oleba -- Peoples National Bank of Washington, Yakima, Washington. All of the accounts were opened with nominal deposits. The Karolina account was designated as a "general partnership" account; the other accounts were designated as joint tenancy with right of survivorship accounts. Olaf and Curtis were the only persons authorized to withdraw funds from the accounts established in the names of Delta, Karolina, and Triangle; Olaf, Bertha, and Curtis were the only persons authorized to withdraw *553 funds from the Sheridan account; Olaf and Bertha were the only persons authorized to withdraw funds from the Oleba account. The opening of these accounts completed the formation of the two groups of business trusts. Toward the latter part of October 1976, Curtis and Olaf began to use the first group of business trusts in connection with their operation of Akland Irrigation. Commencing in October 1976, and continuing through all of the years in issue, Curtis prepared numerous "invoices" which purport to show that Akland Irrigation either purchased certain goods from Karolina and Triangle, or made payments to Karolina and Triangle for services rendered to Akland Irrigation by those trusts. In reality, however, Karolina and Triangle never engaged in any trade or business and never supplied any goods or rendered any services to Akland Irrigation. In the normal course of Akland Irrigation's business, *554 Leta Watson, the corporation's bookkeeper, reviewed invoices and prepared the corporation's checks to pay for the goods or services represented by those invoices. Ms. Watson then presented the checks to Curtis for his signature. After he had determined that the price on the invoice was correct and that the corporation had received the goods or services as stated in the invoice, Curtis would sign the checks that had been prepared by Ms. Watson. During each of the years in issue, Curtis randomly selected certain invoices from those presented to him by Ms. Watson, voided the checks that had been prepared with respect to the selected invoices, and paid the vendors the price shown on the invoices with checks drawn on the bank accounts of either Karolina or Triangle. [9] Curtis then prepared documents which appear to be "invoices" of Karolina and Triangle addressed to Akland Irrigation. These invoices purport to show that certain goods or services which had been supplied or rendered directly to Akland Irrigation had instead been supplied or rendered by either Karolina or Triangle. Using preprinted forms, Curtis gave the Karolina and Triangle invoices the appearance of authenticity *555 by including customer order numbers, dates, terms of sale, and a description of goods supplied or services rendered. The addresses shown on the invoices were the addresses of the banks in Portland and Seattle at which accounts had been opened in the names of Karolina and Triangle. These fabricated invoices were ultimately paid by Akland Irrigation. Thus, according to Curtis and Olaf, the transfer of the goods and services described in the Karolina and Triangle invoices occurred in two steps: (1) An initial purchase of the goods or services from the actual supplier by either Karolina or Triangle; and (2) a subsequent sale of those same goods or services to Akland Irrigation. With respect to these transactions, Curtis was supposedly acting on behalf of Karolina and Triangle, as a trustee of A.K. Land (the purported trustee of both Karolina and Triangle), and also on behalf of Akland Irrigation as the corporation's vice-president. Although the Karolina and Triangle invoices describe goods and services which were, in fact, received by Akland Irrigation, but not from *556 Karolina and Triangle, the prices which appear on those invoices greatly exceeded the true prices charged by the actual suppliers of those goods and services. For example, on one occasion, goods which actually cost $45.02 were paid for with a check for that amount drawn on the bank account of Triangle and then, pursuant to an invoice prepared by Curtis, "resold" to Akland Irrigation for $18,823.27. On another occasion, goods which actually cost only $30.66 were similarly "resold" to the corporation by Karolina for $13,030.66. [10] The record further shows that the price increases were entirely arbitrary and that, for some "resales," Curtis fabricated two invoices with respect to a single order of goods. Pursuant to Curtis' direction, and in accordance with the inflated prices shown on the Karolina and Triangle invoices, Akland Irrigation issued numerous checks made payable to Karolina and *557 Triangle. Curtis then deposited the checks in the Karolina and Triangle bank accounts, and the amounts so deposited were included in Akland Irrigation's cost of goods sold computations during the years in issue. As a result of the above-described transactions, goods and services which had a total actual cost of less than $5,000 were reported as costing Akland Irrigation $282,342.57, as follows: Years Ending
Bank Deposits
October 31
Karolina
Triangle
Total
1976
$ 19,101.85
$ 17,231.15
$ 36,333.00
1977
40,368.82
40,242.32
80,611.14
1978
35,389.26
35,714.99
71,104.25
1979
45,364.52
48,929.66
94,294.18
TOTALS
$140,224.45
$142,118.12
$282,342.57
The amounts transferred to the Karolina and Triangle bank accounts were later "distributed" to Delta, the holder of the Karolina and Triangle trust certificate units, and deposited in the Delta bank account. For each year in issue, Curtis filed a Form 1040-NR, "U.S. Nonresident Alien Income Tax Return," under names of Karolina and Triangle; however, the "profit" [11] reported on the returns was entirely offset by a deduction which represented the distribution made to Delta during the year. No *558 Federal tax returns were filed under the name of Delta. On November 19, 1976, Olaf and Curtis each received $17,000 as a direct distribution from Delta. After 1976, however, Olaf and Curtis transferred the Delta trust certificate units to A.K. Land, and Delta ceased to make distributions with respect to its trust certificate units. Instead, the distributions to Delta were purportedly "loaned" back to Karolina and Triangle in exchange for "promissory notes" payable on demand. The notes of Triangle were then "gifted" to Curtis and their payment was immediately demanded; the notes of Karolina were "gifted" to Oleba (during 1977 and 1978) or Olaf (during 1978 and 1979) and payment of these notes was also immediately demanded. From 1976 through 1979, either as a result of the 1976 distribution to Olaf and Curtis which was funneled through Delta or as a result of the payment of the Karolina and Triangle "promissory notes," approximately $137,500 was transferred *559 from the Karolina bank account and approximately $132,500 was transferred from the Triangle bank account. The funds transferred from the Triangle bank account were deposited in a personal bank account owned by Curtis and Arden and maintained in their names; the funds transferred from the Karolina account were deposited either in a personal bank account owned by Olaf and Bertha and maintained in their names, or in bank accounts owned by Olaf and Bertha but maintained in the name of Oleba. [12] The funds transferred to the bank accounts maintained in the names of the petitioners were intermingled with amounts already on deposit in those accounts and portions of the funds were used to pay numerous personal expenses of the petitioners. None of the funds were reported on the petitioners' 1976 through 1979 tax returns. The second group of business trusts did not purport to sell goods or render services to Akland Irrigation. As noted above, however, funds from the Karolina bank account were deposited *560 in bank accounts in the name of Oleba. In addition, with respect to the preferred stock of Akland Irrigation that was purportedly transferred from Olaf to Oleba, Akland Irrigation paid dividends to Oleba in the amount of $8,400 for each of the years in issue. Olaf and Bertha purported to control the activities of the second group of trusts as trustees of Denhoff. On December 31, 1976, Oleba "distributed" $8,400 to Sheridan, the holder of the Oleba trust certificate units, and Sheridan made an equivalent distribution to Olaf and Bertha. After 1976, however, Olaf and Bertha transferred the Oleba trust certificates to Denhoff. Thereafter, as with the first group of trusts, Sheridan purported to "loan" its distributions back to Oleba in return for "promissory notres" payable on demand. These notes were immediately "gifted" to Olaf, and upon demanding payment of the notes Olaf received cash from Oleba. Neither the distribution from Sheridan nor the amounts received upon payment of the Oleba "promissory notes" was included in the 1976 through 1979 tax returns of Olaf and Bertha. Although Forms 1040-NR were filed on behalf of Oleba for the years in issue, the income shown on those *561 returns was offset by a deduction for the distributions made to Sheridan. Throughout the period in question, substantial portions of the funds transferred from Akland Irrigation to the various bank accounts described above were ultimately transferred back to the corporation by way of loans from Olaf and Curtis. During this period, they each loaned the corporation approximately the same amount at interest rates which varied from eight to ten per cent. Akland Irrigation claimed deductions for the interest paid to Olaf and Curtis with respect to the amounts loaned, and the interest so paid was included in the 1976 through 1979 tax returns of the individual petitioners. Although Akland Irrigation's tax returns were prepared by a firm of certified public accountants prior to 1976 and throughout the years in issue, the firm was never consulted with respect to the propriety of the transactions described above. The corporation's part-time bookkeeper, Thomas, was the only person other than the petitioners who understood the relationship between the petitioners and the two groups of business trusts. The corporation's suppliers were never aware that Curtis was fabricating invoices with *562 respect to the goods and services that they had supplied to Akland Irrigation. On May 23, 1980, Olaf, Bertha, and Curtis purported to resign from their positions as trustees of A.K. Land and Denhoff. Their resignations were ostensibly accomplished by simply appointing an organization known as Continental Associates, Ltd., a corporation allegedly formed and operated under the laws of Belize, as the new trustee of both A.K. Land and Denhoff. ULTIMATE FINDINGS OF FACT All of the business trusts were shams. Akland Irrigation's income tax returns for its fiscal years 1976 through 1979 and the individual petitioners' income tax returns for the years 1976 through 1979 were fraudulent and filed with the intent to evade taxes believed to be owing. OPINION The first issues we consider are: (1) Whether Akland Irrigation is entitled to include the amounts paid to Karolina and Triangle in computing its cost of goods sold; and (2) whether, and if so to what extent, those amounts were constructive dividends to Olaf and Curtis. The petitioners contend that all of the business trusts in this case were valid entities, legally independent and separate from themselves as individuals, *563 and that the trusts and the transactions in which they took part should be recognized for Federal tax purposes. With respect to the first group of trusts, the petitioners argue that Karolina and Triangle purchased various goods and services which were in turn resold to Akland Irrigation. The petitioners further argue that the amounts which they received from Karolina and Triangle were nontaxable gifts rather than constructive dividends. As to the second group of trusts, Olaf and Bertha contend that Oleba was the true earner of the Akland Irrigation preferred stock dividends and the interest received from the bank accounts maintained in the name of that trust. It is respondent's position that both groups of business trusts were shams, that the transactions in which the trusts purported to engage were totally without economic substance, and that the trusts existed for no purpose aside from being used in a scheme to obtain tax benefits at no economic cost to either Akland Irrigation or the individual petitioners. Accordingly, with respect to the first groupof trusts, respondent determined deficiencies against Akland Irrigation and the individual petitioners on the basis: (1) That *564 in determining its gross income the corporation was not entitled to treat the amounts that it transferred to the bank accounts of Karolina and Triangle as part of its cost of goods sold; and (2) that the amounts transferred to those bank accounts were constructive dividend distributions to Olaf and Curtis, the corporation's only shareholders. With respect to the second group of trusts, respondent determined deficiencies against Olaf and Bertha on the basis that they failed to report both the preferred stock dividends paid by Akland Irrigation to Oleba and the interest earned on the Oleba bank accounts. Respondent further contends, in the alternative, that, if we conclude that the various business trusts were valid entities for tax purposes, then the individual petitioners are taxable on the income reported as earned by Karolina, Triangle, and Oleba under the grantor trust provisions of sections 671 through 679. In response to this argument, the petitioners argue that sections 671 through 679 apply only in the case of ordinary trust arrangements, having no application to situations involving common law business trusts. We are convinced that all of the business trusts in this case *565 were shams, therefore, we do not address the arguments raised by the parties with respect to the grantor trust provisions. It is well settled that taxpayers have the right to conduct their transactions in such a manner and form as to minimize or altogether avoid the incidence of taxation by whatever means the law permits. See Gregory v. Helvering,293 U.S. 465, 469 (1935). The government, however, is not required to apply the tax laws in accordance with the form employed bythe taxpayer where that form is a sham or is inconsistent with economic reality. Higgins v. Smith,308 U.S. 473, 477 (1940). When the form of the transaction has not, in fact, altered any cognizable economic relationships, that form will be ignored and the law will be applied according to the substance of the transaction. Marksoian v. Commissioner,73 T.C. 1235 (1980). With these principles in mind, we initially focus our attention on the first group of business trusts: A.K. Land, Delta, Karolina, and Triangle. Olaf and Curtis, the only shareholders of Akland *566 Irrigation, were the trustees of A.K. Land, the designated trustee of the other three trusts. Pursuant to the express terms of the declaration which established each trust, i.e., that the trustees were to act as "absolute owners" of the trust and that resolutions of the trustees "authorizing a special thing to be done shall be evidence that such an act [was] within [their] power," Olaf and Curtis exercised complete dominion and control over all four trusts. Ostensibly, the sole asset of A.K. Land was cash in the amount of $5, while the sole asset of Delta, Karolina, and Triangle was one bank account each. Olaf and Curtis were the only persons with the authority to withdraw funds from these accounts. In form, Karolina and Triangle purchased certain goods and services of nominal value, and then immediately resold those very same goods and services to Akland Irrigation at prices which greatly and arbitrarily exceeded their actual cost to Karolina and Triangle. However, is reality, besides receiving payment with checks printed with the names of Karolina or Triangle (checks signed by Curtis), the bona fide suppliers of those goods and services had absolutely no contacts with *567 or knowledge of either Karolina or Triangle. All of the invoices from the suppliers were addressed to Akland Irrigation; all of the goods and services represented by those invoices had been supplied or rendered directly to the corporation prior to their alleged purchase and resale by Karolina and Triangle. Thus, Karolina and Triangle never purchased and resold any goods or services and Akland Irrigation never purchased any goods or services from either Karolina or Triangle at any price. Since the alleged purchases and resales were the only "business" purportedly engaged in by Karolina and Triangle, and because no purchases or resales in fact occurred, we conclude that Karolina and Triangle were shams and, as such, they are not entitled to be recognized for Federal tax purposes. Zmuda v. Commissioner,79 T.C. 714, 719-22(1982); Professional Services v. Commissioner,79 T.C. 888, 929 (1982). Moreover, because Akland Irrigation never purchased any goods or services from Karolina and Triangle, it follows that, in determining its cost of goods sold for each year in issue, the corporation is not entitled to include the amounts which it transferred *568 to the Karolina and Triangle bank accounts ostensibly as payment for certain goods and services. [13]
We next turn to the question of whether those amounts were constructive dividends to Olaf and Curtis. In form, all of the "income" of Karolina and Triangle was transferred to Delta during each year in issue. In 1976, Olaf and Curtis each received $17,000 directly from Delta, and it appears that Olaf and Curtis simply considered this transfer to be a nontaxable gift. After 1976 and through 1979, in accordance with a predetermined plan, the "income" of Karolina and Triangle was received by Olaf and Curtis, in form, as follows: (1) The "income" was transferred to Delta and then "loaned" back to Karolina and Triangle in exchange for "promissory notes" payable on demand; (2) the Karolina "notes" were then "gifted" to Olaf or Oleba, *569 while the Triangle "notes" were "gifted" to Curtis; (3) Olaf, Oleba, or Curtis received cash upon demanding payment of the Karolina and Triangle "notes." These steps, which usually occurred on the same day, were apparently taken in an effort to achieve a "tax-free" transfer of the funds in the Karolina and Triangle bank accounts to Olaf and Curtis. It appears that the Karolina and Triangle "promissory notes" were created so that Delta would be transferring "intangible property," within the meaning of section 2501(a)(2), to Olaf, Curtis, and Oleba. [14] On the authority of section 2501(a)(2), Olaf and Curtis apparently considered the cash which they or Oleba received upon demanding payment of the Karolina and Triangle "notes" to be completely nontaxable. *570 We first observe that the petitioners' reliance on section 2501 is entirely misplaced. That section is applicable only in the case of the gift tax and does not purport to have any relevance to the income tax. Having found that Karolina and Triangle were complete shams, it follows that there was no "income" belonging to those purported trusts which could have followed the above-described path on its way to Olaf and Curtis. Thus, upon viewing the economic realities of this case, it is obvious to us that Delta was a complete sham and that the the various transactions in which it purportedly engaged in were without economic substance. Further, any argument that the amounts transferred from Karolina and Triangle were nontaxable gifts has no basis in reality.
Under section 316, a "dividend" is defined as any distribution of property made by a corporation to its shareholders out of its earnings and profits. [15] The law is well established that, even though the formalities of a dividend declaration *571 have not been followed, and even where the corporation never intended to declare or pay a dividend, the receipt of a constructive dividend may be found where the corporation has, in fact, conferred an economic benefit upon its shareholders. Loftin and Woodward, Inc. v. United States,577 F.2d 1206 (5th Cir. 1978), revg. and remanding an unreported District Court decision; Sachs v. Commissioner,277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). We observe that, by arbitrarily inflating the price at which Akland Irrigation allegedly "purchased" goods and services from Karolina or Triangle, Olaf and Curtis were able to determine the precise amounts transferred each year to the Karolina and Triangle bank accounts. We note also that Akland Irrigation had only two shareholders and that it purported to "purchase" goods and services from two alleged business trusts. Moreover, pursuant to these "purchases," approximately the same amount of cash was transferred *572 to the bank account of each "trust" during each year for four years, with the cash transferred to the Karolina account ultimately being transferred only to Olaf and Bertha and the cash transferred to the Triangle account ultimately becoming the sole property of Curtis and Arden. The cash transferred to the individual petitioners was combined with cash previously belonging to the petitioners and portions of the combined funds were used to pay numerous personal expenses of the petitioners. Although portions of those funds were eventually loaned to Akland Irrigation, Olaf and Curtis were under no obligation to make these loans or to otherwise contribute any of the funds to Akland Irrigation. In addition, as a result of these loans, Olaf and Curtis received substantial interest payments from Akland Irrigation during each year in issue. Accordingly, we conclude that Olaf and Curtis both received constructive dividends from the corporation during each year in issue. In his notices of deficiency and amended answers, respondent asserted deficiencies against the individual petitioners on the basis that the sum of the amounts transferred from Akland Irrigation to the Karolina and Triangle *573 bank accounts were constructive dividends as to Olaf and also as to Curtis. On brief, however, respondent's counsel explained that this position was taken simply as a protective measure as a result of respondent's uncertainty as to the amount of cash received by each individual. Upon carefully reviewing the record as a whole, we conclude that Olaf ultimately received only the amounts transferred to the Karolina account, while Curtis received only the amounts transferred to the Triangle account. Furthermore, we observe that the goods and services with respect to which Curtis fabricated invoices were paid for with a portion of the cash (approximately one per cent) which had been distributed from Akland Irrigation to Olaf (i.e., to the Karolina account) or Curtis (i.e., to the Triangle account). Because those goods and services were paid for with checks drawn on the Karolina and Triangle accounts, as part of the overall scheme employed in this case, we believe that Olaf and Curtis were simply acting as agents for the corporation when paying for those goods and services, and that the amount of economic benefit which they received as a result of the distributions to the Karolina and *574 Triangle accounts should be adjusted accordingly. In view of the foregoing, we conclude that Olaf received constructive dividends each year equal to the amounts distributed to the Karolina account, less the small amounts used each year to pay for the goods and services described in the Karolina "invoices," while Curtis received constructive dividends each year equal to the amounts distributed to the Triangle account, less the small amounts used each year to pay for the goods and services described in the Triangle "invoices." Turning to the second group of business trusts -- Denhoff, Sheridan, and Oleba -- we next consider whether Olaf and Bertha are taxable on the dividend and interest income reported as earned by Oleba. Olaf and Bertha were the trustees of Denhoff, the designated trustee of both Sheridan and Oleba. Pursuant to the provisions of the instruments which purport to establish each trust -- again, that the trustees were to act as "absolute owners" of the trust and that resolution of the trustees "authorizing a special thing to be done shall be evidence that such an act [was] within [their] power" -- Olaf and Bertha exercised complete dominion and control over *575 each trust. In form, Denhoff owned cash in the amount of $5, Sheridan owned one bank account, and Oleba was the owner of the following assets: (1) Three bank accounts; (2) the preferred stock of Akland Irrigation; (3) two parcels of unimproved real property. However, pursuant to the express terms of the trust documents, this form did not alter any cognizable economic relationships since, as trustees of the second group of trusts, Olaf and Bertha were at all times the owners of these assets, just as though this form had never been employed. Moreover, the second group of business trusts did not even purport to engage in any trade or business, but instead "existed" simply to funnel cash from Akland Irrigation to Olaf and Bertha. [16] Finally, the form employed to transfer this cash, i.e. either as direct "gifts" to Olaf and Bertha or by way of purported "loans" from Oleba to Sheridan in exchange for "promissory notes" which were then "gifted" to Olaf, was simply without substance. In view of the foregoing, we conclude that all of the trusts in the second group of business trusts were shams and that, in substance, Olaf and Bertha were the true owners of the preferred stock of Akland *576 Irrigation and the bank accounts established in the name of Oleba. Accordingly, respondent is sustained on this issue. See Zmuda v. Commissioner,79 T.C. 714, 719-22 (1982); Professional Services v. Commissioner,79 T.C. 888, 929 (1982). The next issues are whether Akland Irrigation is entitled to a deduction, under section 162, for the $6,000 that it paid in 1976 to the ALES to obtain the package of materials relating to common law business trusts, and whether this payment was a constructive dividend to Olaf. Respondent determined that the payment to the ALES served no corporate purpose but, instead, served the personal interests of Olaf, the corporation's majority shareholder. *577 Accordingly, respondent determined deficiencies against Akland Irrigation and against Olaf and Bertha on the basis: (1) That the corporation was not entitled to deduct the payment under section 162; and (2) that the payment was a constructive dividend to Olaf. We agree with respondent as to both counts.
Section 162 provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The expense of acquiring the package of materials from the ALES was paid for the purpose of establishing the various business trusts presented in this case. Ostensibly, the only contact that Akland Irrigation ever had with the business trusts was the "purchase" of goods and services from Karolina and Triangle which, in reality, had already been acquired by the corporation or had already been rendered to it. Neither the creation nor the operation of the business trusts in any way furthered Akland Irrigation's business. Under these circumstances, we cannot see how the payment to the ALES was an "ordinary and *578 necessary" expense of Akland Irrigation within the meaning of section 162.See Welch v. Helvering,390 U.S. 111 (1933). We, therefore, hold that Akland Irrigation is not entitled to deduct the cost of acquiring the package of trust materials.
An expenditure made by a corporation which primarily advances a shareholder's personal interests as opposed to the interests of the corporation may result in the receipt of a constructive dividend by the shareholder. Sachs v. Commissioner,supra;Nicholls, North, Buse Company v. Commissioner,56 T.C. 1225, 1238 (1971). As noted above, the $6,000 payment to the ALES in no way advanced the interests of Akland Irrigation. Instead, the payment was made to obtain a package of materials which Olaf used to allegedly engage in some form of estate planning [17] and, also, to receive substantial amounts of cash from Akland Irrigation through the use of two groups of purported business trusts established with that package. Under these circumstances, we believe that the payment primarily advanced the personal *579 interests of Olaf and, therefore, represents a constructive dividend to him. The final issue concerns the propriety of the additions to tax asserted by respondent with respect to Akland Irrigation and the individual petitioners.
Section 6653(b) provides that, if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 per cent of the underpayment. Whether fraud exists under section 6653(b) is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. by unpublished order 578 F.2d 1383 (8th Cir. 1978). Respondent bears the burden of proving fraud by clear and convincing evidence. Section 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971). Respondent is not, however, required to prove the precise amount of underpayment resulting from fraud, but only that some part of it is attributable to fraud. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). *580 In order to prove fraud, respondent must show that the taxpayer acted with the intent to evade a tax believed to be owing. Stolzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). The requisite intent may be inferred from any conduct the likely effect of which would be to mislead or to conceal. Spies v. United States,317 U.S. 492, 499 (1943). Because a corporation can act only through its officers, in determining fraud on its part, we must look to the acts of the officers made on behalf of the corporation; i.e., fraud in the case of a corporation depends upon the fraudulent intent of its officers. Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963). During each year in issue, there were several acts repeatedly engaged in by Olaf and Curtis which support a finding of fraud, the foremost being the fictitious "sales" of goods and services to Akland Irrigation at exorbitant "prices" and the reflection of such "prices" in the cost of goods sold on the corporation's tax returns. *581 We are convinced that both Olaf and Curtis knew that these "sales" were completely fictitious, that they were based upon fictitious invoices, and that Akland Irrigation's gross income was being improperly understated as the result of a scheme that had no basis in reality. Furthermore, on the basis of Olaf's and Curtis' control over the "prices" at which the "sales" took place, and due to the fact that Olaf and Curtis used two separate "trusts" to engage in "sales" with Akland Irrigation, we are also convinced that Olaf and Curtis knew perfectly well that these "sales" were simply part of a predetermined and fraudulent scheme to distribute cash from the corporation to themselves as shareholders. Indeed, Olaf's and Curtis' whole course of conduct supports the conclusion that they could not have honestly believed that the use of the various business trusts would properly result in the tax benefits claimed throughout the period in issue. For example, Olaf and Curtis opened bank accounts in the names of the trusts at banks located hundreds of miles from their residences and Akland Irrigation's place of business. In addition, we note that during the four-year period in issue Olaf *582 and Curtis never once sought professional advice with regard to their involvement with the two groups of business trusts. In light of the substantial tax benefits hoped for by Olaf and Curtis, and their repeated contacts with certified public accountants during the before the years in question, this failure to seek professional assistance convinces us that they made a conscious effort to conceal their association with the ALA and the business trusts. Moreover, while conducting the audit of Aklan Irrigation's returns, respondent's agents repeatedly questioned Curtis as to the corporation's contacts and associations with business trusts. In response to the agents' questioning, Curtis falsely stated that, beyond the payment of the preferred stock dividends to Oleba, he had no knowledge of any business trusts. Finally, the record shows that Olaf and Curtis were successful and knowledgeable businessmen with control over an enterprise of significant size. This fact further convinces us that they could not have honestly thought that the scheme employed in this case constituted a legitimate method of achieving tax benefits. Accordingly, after carefully considering and weighing all of *583 the evidence presented herein, we conclude and have found as an ultimate fact, that, as to both Akland Irrigation and the individual petitioners, at least part of the underpayment for each year in issue was due to fraud. [18] Respondent is, therefore, sustained on this issue. See Professional Services v. Commissioner,supra.
Decisions will be entered under Rule 155.
Footnotes
1. Consolidated herewith are the cases of Akland Irrigation Commpany, Inc., docket Nos. 4899-80, 7256-81, 18928-81; Curtis C. and Arden A. Akland, docket No. 19826-81; and Olaf C. and Bertha K. Akland, docket No. 18927-81.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the Court has concluded that the post-trial procedures set forth in that rule are not applicable to this case. Hereinafter, all Rule references are to the Tax Court Rules or Practice and Procedure.
4. Respondent concedes that petitioner Akland Irrigation Company, Inc., is entitled to deduct $1,420 of accounting expenses paid in 1976, and that this payment does not constitute a constructive dividend to petitioner Olaf C. Akland.↩
5. "A business or common-law trust, commonly known as a 'Massachusetts trust,' is a form of business organization consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest is divided, which certificates entitle the holders to share ratably in the income of the property, and, on termination of the trust, in the proceeds thereof[.]" 12A C.J.S. BusinessTrusts↩ § 2 (1980).
6. Except for the name of the trust, the designated "transferor" and the designated holder or holders of the trust's beneficial interest, the provisions of the documents which purport to establish each of the seven trusts were identical.↩
7. Olaf allegedly believed that the transfer of these parcels to Oleba would somehow eliminate any claim that California or North Dakota might otherwise have against his estate. However, the "deeds" which purport to transfer these properties to Oleba were never recorded, and the property tax bills on the two properties remained addressed to Olaf.↩
8. A bank account for Triangle was originally opened with the First National Bank of Oregon, but that account was closed approximately two weeks later when the bank notified Curtis that, after reviewing the declaration of trust of Triangle, it no longer wanted the Triangle account.↩
9. The address which appears on the checks of both Triangle and Karolina is the address of Curtis' residence.↩
10. This merchandise was ordered by the corporation on or about October 10, 1976. Although the Karolina invoice which purports to evidence the sale of this merchandise is dated October 10, 1976, the documents which purport to create Karolina were not even executed until October 18, 1976.↩
11. "Gross receipts" shown on the returns, i.e., the amounts received from Akland Irrigation, were reduced by the actual cost of the goods and services purportedly sold to the corporation and various insignificant deductions.↩
12. In addition to the bank account established in the name of Oleba soon after Curtis returned from Grand Turk, Olaf and Bertha established two other bank accounts in the name of Oleba.↩
13. An adjustment under Rule 155 will be required to reflect the fact that, in reality, Akland Irrigation ultimately incurred the cost of the goods and services described in the Karolina and Triangle "invoices." See discussion at pages 29 and 30. This adjustment should, of course, be made on the basis of the actual cost of such goods and services.↩
14. Section 2501 provides, in part: (a) Taxable Transfers.-- (1) General rule.--A tax, computed as provided in section 2502, is hereby imposed for each calendar year on the transfer of property by gift during such calendar year by any individual, resident or nonresident. (2) Transfers of intangible property.--Except as provided in paragraph (3), paragraph (1) shall not apply to the transfer of intangible property by a nonresident not a citizen of the United States.↩
15. The parties have stipulated that Akland Irrigation had earnings and profits in excess of the amounts transferred to the Karolina and Triangle bank accounts.↩
16. Although the second group of trusts purported to own two parcels of real property, the quit claim deeds which ostensibly served to convey these parcels were never recorded and no trust in the second group ever purported to engage in any transactions with respect to the properties. Upon examining the record herein, it seems that these properties were "transferred" to Oleba simply to add the appearance of legitimacy to the second group of business trusts.↩
17. See Footnote 7, supra.↩
18. Pursuant to section 6653(b), this holding eliminates the additions to tax asserted against Akland Irrigation and the individual petitioners under section 6653(a)↩ for negligence.